Filed: August 2, 2011

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 10-4417
(1:09-cr-00421-CCB-1)

UNITED STATES OF AMERICA,

    Plaintiff - Appellant,

        v.

STEPHEN GERARD DIGIOVANNI,

    Defendant - Appellee.

O R D E R

The Court amends its opinion filed July 25, 2011, as follows:

On page 12, second full paragraph, line 3 –– the word "second" is inserted before the word "prong."

On page 20, lines 7, 10, and 11 –– "(6)" is replaced with "(8)", "(8)" is replaced with "(9)", and "(9)" is replaced with "(10)".

For the Court – By Direction

/s/ Patricia S. Connor
             Clerk

PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

        *Plaintiff-Appellant,*

v.

STEPHEN GERARD DIGIOVANNI,

        *Defendant-Appellee.*

No. 10-4417

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Catherine C. Blake, District Judge.
(1:09-cr-00421-CCB-1)

Argued: May 12, 2011

Decided: July 25, 2011

Before MOTZ and DIAZ, Circuit Judges,
and HAMILTON, Senior Circuit Judge.

Affirmed by published opinion. Senior Judge Hamilton wrote
the opinion in which Judge Motz and Judge Diaz joined.

## COUNSEL

**ARGUED:** Ayn Brigoli Ducao, OFFICE OF THE UNITED
STATES ATTORNEY, Baltimore, Maryland, for Appellant.
Marta Kahn, Baltimore, Maryland, for Appellee. **ON BRIEF:**
Rod J. Rosenstein, United States Attorney, Baltimore, Mary-

land, for Appellant. William B. Purpura, PURPURA & PUR-PURA, Baltimore, Maryland, for Appellee.

<hr>

**OPINION**

HAMILTON, Senior Circuit Judge:

The United States appeals from an order of the district court granting the motion to suppress certain evidence filed by the defendant, Stephen Digiovanni. We affirm.

I

On July 28, 2009, at approximately 11:53:00 a.m., Trooper Christopher Conner of the Maryland State Police observed Digiovanni's car traveling northbound on Interstate 95 (I-95), in northeast Maryland, near the towns of North East and Perryville. In Trooper Conner's opinion, Digiovanni's car was traveling too close to the car in front of him, in violation of Maryland law. Consequently, Trooper Conner activated his patrol car's blue lights (which in turn activated his patrol car's video and recording equipment) and effectuated a stop of Digiovanni's car.

At approximately 11:53:39 a.m., Trooper Conner approached Digiovanni's car, now stopped on the right shoulder of the road, identified himself as a Maryland state trooper, and asked Digiovanni to provide his driver's license and the car's registration, explaining to Digiovanni that he was following the car in front of him "entirely too close." In response, Digiovanni, who was the sole occupant of the car, indicated that the car he was driving was a rental car, so he provided the rental contract, along with his Massachusetts driver's license. As Digiovanni handed over these items, Trooper Conner directed him to exit the car, which he did.[1]

<hr>

[1]As the requested items were passed, Trooper Conner noticed Digiovanni's hands were trembling.

Such direction occurred at approximately 11:54:09 a.m., or about thirty seconds after Trooper Conner first approached Digiovanni's car. According to Trooper Conner, he asked Digiovanni to exit the car for the purpose of issuing him a warning ticket and for the purpose of determining whether there was criminal activity afoot.[2]

While collecting Digiovanni's driver's license and the rental contract, Trooper Conner noticed two shirts hanging in the rear passenger compartment and a hygiene bag on the back seat. He also noticed the interior of the car was clean. At the suppression hearing, Trooper Conner testified that the hanging shirts suggested Digiovanni may be involved in drug trafficking activity, because, through his experience, non-drug traffickers traveling on vacation would have such items packed in a clothing bag. Trooper Conner also testified that the hygiene bag on the back seat was suggestive of drug trafficking activity, because there was no other visible luggage in the car. As for the clean condition of the interior of the car, Trooper Conner indicated this was suggestive of drug trafficking activity, because "[t]here was nothing in the vehicle indicating that [he was] living on the road, nonstop driving."

At the suppression hearing, Trooper Conner testified that the rental contract also made him suspicious of drug trafficking activity. The rental contract indicated that the car was rented at Fort Lauderdale International Airport the previous day and was to be dropped off at Logan International Airport in Boston, at a cost of $438. Trooper Conner testified that Digiovanni's one-way, $438 car rental was "implausible."

After Digiovanni exited the car, he walked to the rear of the

---

[2] Trooper Conner is a member of the Pro-Active Criminal Enforcement Team (PACE), a Maryland State Police task force that focuses on criminal traffic enforcement on Maryland roadways to identify drug, criminal, and terrorist organizations that use motor vehicles in the furtherance of their illicit activities.

car, positioning himself near the guardrail. Trooper Conner then retrieved his warning book from his patrol car and returned to where Digiovanni was standing. At this point, Trooper Conner asked numerous questions concerning Digiovanni's travel history and travel plans. All parties seem to acknowledge that perhaps three of these questions related to the justification for the stop, in that, based on his answers, Digiovanni may have offered an explanation for driving too close to the car in front of him. In response to this questioning, Digiovanni indicated that: (1) he was traveling from Florida, where he spent the weekend with family, to Boston, where he lived; (2) on his way to Boston, he was stopping at his sister's residence in New York to pick up "some paintings and whatnot"; and (3) he took the Amtrak Auto Train from Florida to Virginia.

At about 11:56:40, or a little more than three minutes into the stop, Trooper Conner turned his questioning to the subject of drug trafficking activity, because, in his opinion, he had reasonable suspicion that criminal activity was afoot. He asked Digiovanni if he had any luggage in the car and if everything in the car belonged to him. Digiovanni responded in the affirmative to both questions. After these two questions, Digiovanni said, "oh boy," as he tossed the cigarette he was smoking over the guardrail. At the suppression hearing, Trooper Conner testified that he found this remark "extremely suspicious," because "now he is saying oh boy in response to my questioning." Trooper Conner then asked Digiovanni what was the matter, to which Digiovanni replied, "[i]t's just so hot." Trooper Conner explained to Digiovanni that people smuggle drugs and guns up and down I-95, and that "a lot of good people . . . agree to take a box or something . . . [that] [t]hey really don't know what's in it." Trooper Conner told Digiovanni that he was not accusing him of anything, but that he "had a job to do out here." He asked Digiovanni if there was any marijuana in the car. Digiovanni replied, "[n]o sir. I never smoked marijuana in my life. It puts me to sleep."[3]

---

[3]Trooper Conner found Digiovanni's nonsensical answer to his marijuana question "extremely suspicious," because "if you never have smoked it, you wouldn't know that it makes you sleepy."

Trooper Conner asked Digiovanni if there was any cocaine or heroin in the car, and Digiovanni responded in the negative. Trooper Conner also asked Digiovanni if there was any methamphetamine in the car, and Digiovanni indicated that there was not. Trooper Conner followed up with, "[a]re you sure?," to which Digiovanni replied, "I'm positive."

At the conclusion of approximately one minute and thirty-five seconds of questioning concerning drug trafficking activity, Trooper Conner turned his questioning to the subject of consent. Just before asking Digiovanni for consent to search the car, Trooper Conner told Digiovanni that he routinely searches cars "to make sure there's no drugs or guns" in them. In response to his request to search the car, Digiovanni replied, at 11:58:24 a.m., "[i]f you want to, that's not a problem."

For the next three minutes or so, Digiovanni attempted to open the trunk of the car to allow Trooper Conner to search it, but he could not open it. According to Trooper Conner, he found this "extremely suspicious," because Digiovanni, at some earlier time, was able to load his luggage in the trunk. He also testified that, in his experience, drug traffickers often disable the mechanism for opening the trunk.

After Digiovanni was unsuccessful in opening the trunk, Trooper Conner resumed his earlier line of questioning concerning drug trafficking activity at about 12:01:41 p.m. He asked Digiovanni if he was sure there was no marijuana in the trunk of the car, to which Digiovanni said that he was sure there was not. In response, Trooper Conner observed that he had "heard people say that before and then" found drugs, so he asked Digiovanni if he was sure, and Digiovanni responded that he was "positive." Continuing this line of drug questioning, Trooper Conner asked, "[s]o if I bring my drug detection K-9, my partner and my drug detection K-9 up here, would there be any reason why the dog would alert to the vehicle?" Digiovanni replied, "[n]ot at all." Trooper Conner

asked Digiovanni again if he was sure, and Digiovanni once again responded that he was "[p]ositive." This second inquiry concerning drug trafficking activity lasted about one minute.

Trooper Conner returned to his vehicle at about 12:02:37 p.m. Trooper Conner requested back up assistance, because he "believed" Digiovanni "was engaged in criminal activity." He then began the process of checking Digiovanni's driver's license, at 12:03:31 p.m., over ten minutes after Digiovanni was stopped. At approximately 12:07:22 p.m., Trooper Conner removed his hat, exited his patrol car, and approached Digiovanni. Although the driver's license check was not completed by this time, a dispatcher informed Trooper Conner that Digiovanni was not wanted on any outstanding warrants. Trooper Conner told Digiovanni he was "waiting on [the] license check," adding that "things are looking good," because he was not wanted on any warrants. At 12:08:15 p.m., Trooper Conner told Digiovanni he was "preparing" a warning ticket for him, adding that there was "no fine" and "no points." At 12:08:25 p.m., Trooper Conner returned to Digiovanni his driver's license and the rental contract, and issued him a warning ticket and a brochure explaining "what to expect on a traffic stop."[4] At the same time, Trooper Conner said, "[h]ere you go, sir. You are free to go." Immediately (12:08:27 p.m.), Trooper Conner reminded Digiovanni that they "were talking, . . . were talking about drugs." He then observed that "we do have a bad problem out here, people smuggling drugs on the interstate." After implying that

---

[4]It is not entirely clear from the record when Trooper Conner began to fill out the warning ticket, although it is clear that he completed it after he called in Digiovanni's driver's license to the dispatcher. The warning ticket issued to Digiovanni contains the date and time of the stop, his driver's license number, the initials for the State of Massachusetts, Digiovanni's full name, initials for his race and sex, the car's license plate number, the initials for the state in which the plates were issued, the year and make of the car, the location of the stop, and a few miscellaneous letters and numbers. A box for "Following Too Closely" is also checked. All total, there are approximately 100 written characters on the ticket.

Digiovanni was bound by the earlier given verbal consent to search, Trooper Conner asked, "[m]ay I search your car?," to which Digiovanni replied, "[y]es." Trooper Conner then informed Digiovanni that he had a written consent form for him to sign. Digiovanni then walked toward his car, and Trooper Conner told Digiovanni to "hold on a second." At 12:09:03 p.m., Digiovanni was provided the written consent form; he signed it at 12:09:08 p.m.

During the ensuing search, Trooper Conner and a backup police officer recovered 34,091 pills of Oxycodone and $1,450 in United States currency. Digiovanni was arrested and taken to the Maryland State Police JFK Highway Barracks in Perryville. At the police barracks, after being given *Miranda* warnings, Digiovanni made a detailed statement, explaining, among other things, that he was supposed to be paid $10,000 for transporting the pills and that he had transported pills once before.

On August 5, 2009, a federal grand jury sitting in the District of Maryland returned an indictment charging Digiovanni with possession with intent to distribute Oxycodone, in violation of 21 U.S.C. § 841(a)(1). Digiovanni moved to suppress the physical evidence seized following the search and certain statements he made to law enforcement officers. The district court held two hearings, one on March 12, 2010, the other on March 17, 2010. At the conclusion of the March 17 hearing, the district court granted Digiovanni's motion to suppress, setting forth in open court detailed findings of fact and conclusions of law.

In its analysis, the district court observed that the initial stop of Digiovanni's car was "perfectly legitimate." Since the initial stop was legitimate, the district court noted that the stop could last no longer than necessary given the stop's purpose, absent consent or reasonable suspicion. Because the purpose of the stop was to issue Digiovanni a warning ticket for traveling too close to a car in front of him, the district court

observed that, under Fourth Circuit precedent, Trooper Conner was permitted to obtain Digiovanni's driver's license and vehicle registration, run a computer check, and issue the warning ticket.

The district court next addressed the length of the stop, concluding that the stop lasted longer than necessary given that the purpose of the stop was to issue Digiovanni a warning ticket for traveling too close to the car in front of him. In so concluding, the district court found that Trooper Conner did not proceed with diligence in checking the validity of Digiovanni's driver's license, considering the driver's license check was not undertaken until approximately ten minutes into the stop. According to the district court, rather than checking the validity of Digiovanni's driver's license, Trooper Conner "diverted . . . from the ordinary purpose of the traffic stop" and embarked on an unwarranted investigation into drug trafficking that was not supported by reasonable suspicion. In rejecting the government's argument that reasonable suspicion supported the length of Digiovanni's detention, the district court noted that the car was rented in Florida and that Florida is a source state for drugs, as are many other states on the I-95 corridor. The district court found Digiovanni's purported initial nervousness of "limited" relevance, especially since there was "no fumbling in obtaining the license and rental contract" and Digiovanni was cooperative throughout the traffic stop. The district court also found Digiovanni's "oh boy" comment of limited relevance, because the comment was not made in response to a question, and Digiovanni immediately explained why he said "oh boy"—"[i]t's just so hot." The district court further found that Digiovanni's travel itinerary was "somewhat unusual," given the expense (including the cost of the Auto Train) and the distance Digiovanni was driving, though it found that the use of the Auto Train cut against the government's argument, because most drug traffickers would not want to surrender control of their cars to ride on the Auto Train. The district court noted that Digiovanni's appearance and demeanor fit

into the category of a retired person, one traveling from Florida to the northeast. Moreover, the district court found Trooper Conner's reliance on the hanging shirts, the hygiene bag, and the cleanliness of the car suspect, because he offered no "reasonable explanation" for relying on these factors.

Finding no reasonable suspicion to support the length of Digiovanni's detention, the district court turned to the issue of whether Digiovanni's written consent was voluntary, and, if so, whether such consent attenuated the taint of the illegal detention. The district court found that, even though Trooper Conner used the buzz words, "you are free to go," the encounter, under the circumstances, was not consensual. According to the district court, although Trooper Conner used these words and returned the driver's license and rental contract, in virtually the same breath, he immediately returned to the subject of drugs, implying, falsely, that Digiovanni was bound by his earlier consent. The district court also noted that the coercive nature of the encounter was compounded by the fact that Trooper Conner stood in close proximity to Digiovanni. In view of all of the circumstances before it, the district court concluded the written consent was involuntary. Alternatively, the district court seemed to suggest that, even if the written consent was voluntary, it did not purge the taint of the illegal detention.

## II

The government challenges the district court's decision, granting Digiovanni's motion to suppress. With regard to this challenge, we review the district court's factual findings for clear error and its legal conclusions *de novo*. *United States v. Perkins*, 363 F.3d 317, 320 (4th Cir. 2004).

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "[T]he underlying command of the Fourth

Amendment is always that searches and seizures be reasonable." *Wilson v. Arkansas*, 514 U.S. 927, 931 (1995).

When a police officer stops an automobile and detains the occupants briefly, the stop amounts to a seizure within the meaning of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809-10 (1996); *see also United States v. Arvizu*, 534 U.S. 266, 273 (2002) (noting that the Fourth Amendment's protection against "unreasonable searches and seizures" extends to "brief investigatory stops of persons or vehicles"). "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren*, 517 U.S. at 810. Any ulterior motive a police officer may have for making the traffic stop is irrelevant. *Id.* at 813; *see also Ohio v. Robinette*, 519 U.S. 33, 39 (1996) (noting that reasonableness under the Fourth Amendment is evaluated objectively).

A traffic stop typically begins when a car "is pulled over for investigation of a traffic violation." *Arizona v. Johnson*, 129 S. Ct. 781, 788 (2009). It typically ends when the police officer has "no further need to control the scene, and inform[s] the driver and passengers they are free to leave." *Id.*

Because a traffic stop is more analogous to an investigative detention than a custodial arrest, we treat a traffic stop, whether based on probable cause or reasonable suspicion, under the standard set forth in *Terry v. Ohio*, 392 U.S. 1 (1968). *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984); *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977) (*per curiam*); *United States v. Rusher*, 966 F.2d 868, 875 (4th Cir. 1992).

Pursuant to *Terry*, we analyze the propriety of a traffic stop on two fronts. First, we analyze whether the police officer's action was justified at its inception. *Rusher*, 966 F.2d at 875. Second, we analyze whether the police officer's subsequent

actions were reasonably related in scope to the circumstances that justified the stop. *Id.*

With regard to *Terry*'s first prong, there is no dispute that the traffic stop in this case, at its inception, was justified. *See* Md. Code Ann., Transp. art. § 21-310(a) ("The driver of a motor vehicle may not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of the other vehicle and of the traffic on and the condition of the highway."); *see also United States v. Branch*, 537 F.3d 328, 335 (4th Cir. 2008) (noting that a traffic violation "provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop").

Under *Terry*'s second prong, the seizure must be limited both in scope and duration. *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion). With regard to the scope component, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Id.* With regard to the duration component, we evaluate "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 686 (1985); *see also Illinois v. Caballes*, 543 U.S. 405, 407 (2005) (noting that a traffic stop may become "unlawful if it is prolonged beyond the time reasonably required to complete [its] mission"); *Royer*, 460 U.S. at 500 (noting that the scope of a seizure "must be carefully tailored to its underlying justification," and that the government bears the burden to "demonstrate that the seizure it seeks to justify . . . was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure"). In the context of traffic stops, police diligence involves requesting a driver's license and vehicle registration, running a computer check, and issuing a ticket. *United States v. Foreman*, 369 F.3d 776, 781 (4th Cir. 2004); *see also Branch*, 537 F.3d

at 337 ("If a police officer observes a traffic violation, he is justified in stopping the vehicle for long enough to issue the driver a citation and determine that the driver is entitled to operate his vehicle."). If a police officer seeks to prolong a traffic stop to allow for investigation into a matter outside the scope of the initial stop, he must possess reasonable suspicion or receive the driver's consent. *Branch*, 537 F.3d at 336.

While conducting the tasks associated with a traffic stop, a police officer's "questions or actions . . . need not be solely and exclusively focused on the purpose of that detention." *United States v. Mason*, 628 F.3d 123, 131 (4th Cir. 2010). Rather, a police officer may ask questions unrelated to the purpose of the stop, "provided that the unrelated questioning does not extend the encounter beyond the period reasonably necessary to effectuate the purposes of the lawful detention." *Id.*; *see also Johnson*, 129 S. Ct. at 788 (holding that a law enforcement officer's questions "into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure," provided those questions "do not measurably extend the duration of the stop"); *Muehler v. Mena*, 544 U.S. 93, 101-02 (2005) (holding that unrelated questioning that did not extend a seizure did not violate the Fourth Amendment); *United States v. Soriano-Jarquin*, 492 F.3d 495, 501 (4th Cir. 2007) ("In this case, [the police officer's question] did not prolong the stop, as it occurred while [a] police trainee checked the driver's license and registration and prepared his citations.").

Both *Mena* and *Johnson* make clear that unrelated questioning during an investigative stop, including a traffic stop, does not run afoul of the scope component of *Terry*'s second prong. *See United States v. Everett*, 601 F.3d 484, 494 n.10 (6th Cir. 2010) (noting that *Mena* and *Johnson* "stand for the proposition that mere questioning—on any subject—cannot violate the scope prong of *Terry*," and, "[t]herefore, where *Terry*'s duration prong is not at issue, as in [those cases], the subject of the questioning" is irrelevant.). In *Mena*, police officers

entered a house to execute a valid search warrant for weapons and evidence of gang membership. 544 U.S. at 95-96. During the search, an INS officer, who had accompanied the police officers during the execution of the warrant, asked the detained occupants various immigration-related questions even though the law enforcement personnel did not possess reasonable suspicion that anyone in the house was an illegal immigrant. *Id.* at 96. The Court upheld the questioning, even though such questioning was outside of the scope of the justification for the seizure, because the overall detention was not extended by the questioning. *Id.* at 101-02.

While *Mena* did not involve a traffic stop, the Supreme Court's decision in *Johnson* did. There, while one police officer was performing the routine tasks associated with a traffic stop, another police officer asked a passenger about gang affiliation. 129 S. Ct. at 784. As in *Mena*, the unrelated questioning in *Johnson*, though outside the scope of the detention, did not extend the length of time in which the defendant was detained. *Id.* at 784-88.

In *Everett*, the Sixth Circuit addressed whether unrelated questioning that lengthens a defendant's detention gives rise to a Fourth Amendment violation under the duration component of *Terry*'s second prong. 601 F.3d at 487-96. In that case, the defendant was stopped for speeding. *Id.* at 486. After the defendant exited the car, the police officer "did not immediately continue with what she testified was standard traffic-stop procedure—*i.e.*, checking for registration and proof of insurance" (the defendant had earlier informed the police officer that his driver's license was suspended), but instead asked the defendant "'if he had anything illegal on his person, any weapons or narcotics or anything like that, or anything illegal in his vehicle.'" *Id.* at 487. Early in its analysis, the court noted that there were two types of prolongation cases, one where the traffic stop has concluded, in which any subsequent detention is impermissible without the presence of reasonable suspicion, and those in which there is some prolongation

before the stop is completed because the police officer is pursuing parallel investigative purposes, one related to the justification for the traffic stop, the other unrelated. *Id.* at 492 n.9. The court further noted that not all prolongation due to unrelated questioning violates the Fourth Amendment. *Id.* at 493. However, some prolongation becomes "too much" when the "totality of the circumstances surrounding the stop indicates that the duration of the stop as a whole—including any prolongation due to suspicionless unrelated questioning—was [un]reasonable." *Id.* at 494 (internal quotation marks omitted). According to the court, the reasonableness of a police officer's actions during a traffic stop turns on his diligence in accomplishing the purposes of stop, that is, investigating whether a traffic infraction occurred and issuing a ticket. *Id.* The diligence calculus includes an examination of the subject matter of the unrelated questioning and whether the unrelated questioning was conducted out of concern for officer safety. *Id.* at 495. A police officer may proceed with diligence, even though he asks some questions unrelated to the stop, so long as the police officer's "overall course of action during a traffic stop, viewed objectively and in its totality, is reasonably directed toward the proper ends of the stop." *Id.* However, diligence is not present where the police officer "definitively abandoned the prosecution of the traffic stop and embarked on another sustained course of investigation" or where the unrelated questions "constituted the bulk of the interaction" between the police officer and the defendant. *Id.* (citation and internal quotation marks omitted). Applying its totality of the circumstances diligence test to the facts of the case, the court held the case was not "remotely close," because the single question could not possibly constitute a definitive abandonment of the investigation of the traffic stop or constitute the bulk of the encounter between the police officer and the defendant. *Id.* at 495-96.

Recently, in *Mason*, we addressed the duration component of *Terry*'s second prong in the context of a traffic stop. There, the defendant was pulled over for having excessively tinted

windows. 628 F.3d at 126. During the stop, a police officer asked the defendant and a passenger questions concerning their travel plans. *Id.* Such unrelated questioning lasted one to one and one-half minutes. *Id.* at 131. Citing *Mena* and *Johnson*, we recognized that a traffic stop cannot be extended beyond the time reasonably necessary to effectuate the purposes of the stop. *Id.* at 132. Because the police officer "went about his business promptly and with efficiency" and because the overall delay caused by the unrelated questioning was *de minimis*, we held that there was no Fourth Amendment violation with regard to the unrelated questioning. *Id.* In so holding, we cited case law from this court and our sister circuits upholding *de minimis* delays caused by unrelated questioning. *Id.* at 132 (citing *United States v. Farrior*, 535 F.3d 210, 220 (4th Cir. 2008); *United States v. Alexander*, 448 F.3d 1014, 1017 (8th Cir. 2006); *United States v. Purcell*, 236 F.3d 1274, 1279 (11th Cir. 2001)).

To summarize, a traffic stop must be reasonable both in its scope and duration. *Royer*, 460 U.S. at 500. Although there is some debate whether the scope component survives the Supreme Court's decisions in *Mena* and *Johnson*, *see, e.g.*, Reid M. Bolton, Comment, *The Legality of Prolonged Traffic Stops After Herring: Brief Delays as Isolated Negligence*, 76 U. Chi. L. Rev. 1781, 1786-87 (2009), the scope of a police officer's actions during a traffic stop still is relevant to the reasonableness analysis under the Fourth Amendment. *Mason*, 628 F.3d at 132. This is so because, during a stop, a police officer must act reasonably, that is, he must diligently pursue the investigation of the justification for the stop (usually a traffic infraction), *Sharpe*, 470 U.S. at 686, to avoid running afoul of the duration component of *Terry*'s second prong. Like other reasonableness determinations, the diligence determination examines the totality of the circumstances. *Everett*, 601 F.3d at 494. Finally, where a delay can be characterized as *de minimis* under the totality of the circumstances, it will not be recognized as a Fourth Amendment violation. *Mason*, 628 F.3d at 132; *see also Farrior*, 535 F.3d

at 219-20 (holding that a minimal delay in conducting a dog-sniff caused by a police officer's inexperience was *de minimis* where there was no attempt at subterfuge or stalling on the part of the police officer) (internal quotation marks omitted).

Turning to our case, we agree with the district court that Trooper Conner failed to diligently pursue the purposes of the stop and embarked on a sustained course of investigation into the presence of drugs in the car that constituted the bulk of the encounter between Trooper Conner and Digiovanni. In the beginning, the traffic stop in this case stayed close to the script approved in cases such as *Branch* and *Foreman*. *Branch*, 537 F.3d at 337; *Foreman*, 369 F.3d at 781. Trooper Conner asked Digiovanni for his driver's license and the vehicle's registration. Understandably, he asked Digiovanni to exit the car. *See Mimms*, 434 U.S. at 111 n.6 (holding that, "once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures"). However, Trooper Conner's actions and questions that followed bespeak an utter lack of diligence. He asked Digiovanni numerous questions concerning his travel history and travel plans, only a few of which possibly related to the justification for the stop. At the conclusion of this questioning, Trooper Conner embarked on a sustained investigation into the presence of drugs, instead of either completing the warning ticket or beginning the driver's license check. Such investigation began with numerous questions concerning the presence of drugs in the car. After Digiovanni could not open the trunk, Trooper Conner had yet another opportunity to complete the warning ticket or begin the driver's license check. Instead, he continued his questioning of Digiovanni concerning the presence of drugs in the car. About ten minutes into the stop, Trooper Conner returned to his patrol car. Instead of beginning the driver's license check, he radioed for back-up assistance. After doing so, Trooper Conner finally relayed Digiovanni's driver's license information to the dispatcher, and, thereafter,

completed the warning ticket. Approximately fifteen minutes into the stop, Trooper Conner returned to Digiovanni his driver's license and the rental contract, and issued him a warning ticket. In the same breath, he returned to the subject of drugs. Under the totality of the circumstances, we agree with the district court that Trooper Conner did not diligently pursue the traditional purposes of a traffic stop, *i.e.*, investigating whether a traffic infraction occurred and issuing a ticket. *See United States v. Peralez*, 526 F.3d 1115, 1121 (8th Cir. 2008) (holding defendant's Fourth Amendment rights were violated where police officer engaged in a "'blended process'" of conducting a routine traffic stop and a drug investigation, by asking questions related both to the traffic stop and the drug investigation, and the "off-topic questions more than doubled" the time the defendant was detained and "constituted the bulk of the interaction between the trooper and the van's occupants").

On appeal, the government makes four arguments seeking to excuse Trooper Conner's lack of diligence. First, the government argues that any delay caused by the unrelated questioning was *de minimis*, and, therefore, Digiovanni's Fourth Amendment rights were not violated. According to the government, our case is much like the *Mason* case, where the delay caused by the unrelated questioning was one to one and one-half minutes.

We reject the government's reliance on *Mason*. The delay in this case was not *de minimis*. The unrelated questioning was extensive and time-consuming. It started with some unrelated questioning concerning Digiovanni's travel plans and morphed into unrelated questioning concerning the presence of drugs. The record, in particular the video, makes clear that at just about every turn Trooper Conner was conducting a drug investigation instead of a traffic infraction investigation. Indeed, the bulk of the encounter between Trooper Conner and Digiovanni involved a drug investigation, as the driver's

license check did not even begin until approximately ten minutes into the stop, and, in fact, it never was completed.

Second, the government argues that, because the overall length of the traffic stop (approximately fifteen minutes) was reasonable, there was no Fourth Amendment violation. We reject this argument.

We have emphasized that "[t]he maximum acceptable length of a routine traffic stop cannot be stated with mathematical precision." *Branch*, 537 F.3d at 336; *see also United States v. Brigham*, 382 F.3d 500, 511 (5th Cir. 2004) (noting that there is "no constitutional stopwatch on traffic stops"); *see also Robinette*, 519 U.S. at 39 (noting that the determination of reasonableness does not lend itself to bright-line rules). This is so because a multitude of factors can affect the length of a traffic stop, some working in favor of the government, others in favor of the defendant. For example, some computer checks will take longer than others, depending on the speed of the computers involved and whether the car's occupants possess in-state or out-of-state identifications. *Cf. United States v. Boyce*, 351 F.3d 1102, 1106-07 (11th Cir. 2003) (noting that a reasonable delay in obtaining the results of a criminal history check does not run afoul of the Fourth Amendment). A routine traffic stop also can lengthen in time where the driver or one of the passengers provides inaccurate information. *Branch*, 537 F.3d at 336. At the same time, a traffic stop can lengthen where a police officer seeks to investigate a crime completely unrelated to the event that provided the justification for the stop in the first place. *Peralez*, 526 F.3d at 1120-21.

More importantly, the government's argument fails to recognize that investigative stops must be limited both in scope *and* duration. Creating a rule that allows a police officer fifteen minutes to do as he pleases reduces the duration component to a bright-line rule and eliminates the scope inquiry altogether. In its reasonableness jurisprudence, the Supreme

Court has "consistently eschewed bright-line rules," *Robinette*, 519 U.S. at 39, and the scope of a police officer's actions remains relevant in the Fourth Amendment traffic stop inquiry. *Mason*, 628 F.3d at 132.

Third, the government contends that Trooper Conner was entitled to abandon the traffic infraction purpose of the stop because he had reasonable suspicion that criminal activity was afoot. The concept of "reasonable suspicion" "is not readily, or even usefully, reduced to a neat set of legal rules, but, rather, entails common sense, nontechnical conceptions that deal with factual and practical considerations of everyday life on which reasonable and prudent persons, not legal technicians, act." *Foreman*, 369 F.3d at 781.

The Supreme Court has recognized that factors consistent with innocent travel can, when taken together, give rise to reasonable suspicion. *United States v. Sokolow*, 490 U.S. 1, 9 (1989) ("Any one of these factors is not by itself proof of any illegal conduct and is quite consistent with innocent travel. But we think taken together they amount to reasonable suspicion."). The articulated innocent factors collectively must serve to eliminate "a substantial portion of innocent travelers before the requirement of reasonable suspicion will be satisfied." *Foreman*, 369 F.3d at 781.

The reasonable suspicion standard is an objective one, so we examine the facts within the knowledge of Trooper Conner to determine the presence or nonexistence of reasonable suspicion. *Id.* "Additionally, it must be noted that, because the *Terry* reasonable suspicion standard is a commonsensical proposition, '[c]ourts are not remiss in crediting the practical experience of officers who observe on a daily basis what transpires on the street.'" *Id.* at 782 (quoting *United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993)).

In deciding to prolong the traffic stop to allow for an investigation into drug trafficking activity, Trooper Conner relied

on the following facts: (1) the car was rented; (2) the car was coming from a known drug source state (Florida); (3) the car was traveling on I-95, a known drug corridor; (4) the car was clean; (5) two shirts were hanging in the rear passenger compartment; (6) there was a hygiene bag on the back seat; (7) Digiovanni's hands were trembling when he handed over his driver's license and the rental contract; (8) during the travel history questions, instead of answering the question, "[s]o you're coming from Florida?," with a "yes," Digiovanni replied, "I have property in Florida"; (9) Digiovanni's travel itinerary; and (10) Digiovanni's "oh boy" comment.

In *United States v. Foster*, 634 F.3d 243 (4th Cir. 2011), we expressed "concern about the inclination of the Government toward using whatever facts are present, no matter how innocent, as indicia of suspicious activity." *Id.* at 248. The same can be said about many of the facts relied upon by Trooper Conner. Trooper Conner's reliance on the hanging shirts borders on the absurd. He labeled them as suspicious because non-drug traffickers would pack the shirts in a clothing bag. While it is true that we rely upon the "experience and specialized training" of the police officer, *United States v. Johnson*, 599 F.3d 339, 343 (4th Cir. 2010), the "Government must also be able to either articulate why a particular behavior is suspicious or logically demonstrate, given the surrounding circumstances, that the behavior is likely to be indicative of some more sinister activity than may appear at first glance." *Foster*, 634 F.3d at 248. Here, the government offered no plausible explanation to support Trooper Conner's reliance on the two hanging shirts. Equally absurd is Trooper Conner's reliance on the clean car and the hygiene bag on the back seat. The vast majority of rental cars are delivered to the renter clean, and, considering that Digiovanni took the Auto Train, it is not surprising that the car was clean when it was stopped by Trooper Conner. And there is nothing suspicious about a hygiene bag located on the back seat of a car.

There is no question that Trooper Conner was entitled to rely to some degree on Digiovanni's trembling hands. *See Illi-*

*nois v. Wardlow*, 528 U.S. 119, 124 (2000) ("[N]ervous, eva-sive behavior is a pertinent factor in determining reasonable suspicion"). However, the district court understandably dis-counted this fact, because, as the video reveals, Digiovanni appeared calm and cooperative throughout the encounter. *See Mason*, 628 F.3d at 129 (relying on police officer's testimony that an innocent individual's initial nervousness usually sub-sides). With regard to the "oh boy" comment, we cannot dis-turb the district court's finding that this comment was not an expression of nervousness (and could not plausibly be con-strued as such), but rather a comment concerning the hot July weather. Moreover, our review of the video reveals that Trooper Conner's characterization of the "oh boy" comment, as well as his reliance on Digiovanni's answer to his "[s]o you're coming from Florida?" question, are examples of "*post hoc* rationalizations to validate those seizures that happen to turn up contraband." *Foster*, 634 F.3d at 249.

With regard to the car rental, the traveling on I-95, and the traveling from Florida factors, there is little doubt that these facts enter the reasonable suspicion calculus. *See United States v. Brugal*, 209 F.3d 353, 358 (4th Cir. 2000) (*en banc*) (citing car rental travel along I-95 from a source city as fac-tors contributing to reasonable suspicion). With regard to Digiovanni's travel itinerary, Trooper Conner certainly was entitled to rely, to some degree, on its unusual nature in deter-mining whether criminal activity was afoot. *Id.* at 360-61 (noting that an unusual travel itinerary, coupled with other facts, can support a finding of reasonable suspicion).

Nevertheless, we agree with the district court that reason-able suspicion was not present to turn this routine traffic stop into a drug investigation. The articulated facts, in their total-ity, simply do not eliminate a substantial portion of innocent travelers. *Id.* at 361. When he was stopped, Digiovanni was traveling from Florida on I-95 in a car he rented the previous day. For part of the trip, he took the Auto Train. Digiovanni's Auto Train trip clearly cuts against the government's argu-

ment, because drug traffickers routinely avoid places such as airports and train and bus hubs to evade law enforcement and/or drug detention dogs. Moreover, because a driver is separated from his car on the Auto Train, it is unlikely that a drug trafficker would use this mode of transportation. It is true that Digiovanni's travel itinerary is unusual—not many people are flying from Boston to Miami for the weekend, renting a car for the return trip to Boston, traveling part of the way on the Auto Train, and stopping in New York to pick up some paintings. The problem for the government is that this unusual travel itinerary is not keyed to other compelling suspicious behavior. For example, in *Brugal*, the defendant's unusual travel itinerary was coupled with other compelling suspicious behavior. *Id.* at 360-61 (holding that unusual travel itinerary, coupled with, among other factors, evidence of flight, and defendant's implausible story that he exited the interstate to look for gas at an exit that showed no signs of activity created reasonable suspicion permitting the continuation of a traffic stop). In this case, other than Digiovanni's unusual travel itinerary, there is nothing compellingly suspicious about the case. There is no evidence of flight, suspicious or furtive movements, or suspicious odors, such as the smell of air fresheners, alcohol, or drugs. All the government can link to the unusual travel itinerary are the facts that Digiovanni rented a car from a source state, was stopped on I-95, and was initially nervous. Such facts, without more, simply do not eliminate a substantial portion of innocent travelers. *Id.* at 361.

Finally, the government argues that Digiovanni's voluntary written consent to search the car was an act of free will that purged the taint of any alleged Fourth Amendment violation arising from the illegal seizure. Because the purported act of free will is Digiovanni's consent to search, the government must prove by a preponderance of the evidence that his consent to search was voluntary and that his consent was an act of free will sufficient to purge the taint of the Fourth Amendment violation. *Brown v. Illinois*, 422 U.S. 590, 603-04

(1975); *United States v. Seidman*, 156 F.3d 542, 549-50 (4th Cir. 1998).

Although the Fourth Amendment generally prohibits warrantless searches, the general requirement for a warrant does not apply where valid consent to the search is given. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *United States v. Buckner*, 473 F.3d 551, 553 (4th Cir. 2007). "Consent to search is valid if it is (1) knowing and voluntary and (2) given by one with authority to consent." *Buckner*, 473 F.3d at 554 (citations and internal quotation marks omitted). The government bears the burden of establishing, by a preponderance of the evidence, that it obtained valid consent to search. *Id.*

Whether a defendant's consent to a search is voluntary is a factual question, and, therefore, is reviewed under the clearly erroneous standard. *Bustamonte*, 412 U.S. at 248-49. We may reverse the district court's finding concerning voluntariness only if "it can be said that the view of the evidence taken by the district court is implausible in light of the entire record." *United States v. Lattimore*, 87 F.3d 647, 651 (4th Cir. 1996).

In assessing voluntariness of the consent, we examine the totality of the circumstances including factors such as the characteristics of the accused, his education and intelligence, the number of officers present, along with the location and duration of the stop. *Id.* Whether the person giving consent knew that he possessed a right to refuse consent also is relevant in determining the voluntariness of consent, although the government need not demonstrate that the person giving consent knew of his right to refuse consent to prove that the consent was voluntary. *Id.*; *United States v. Boone*, 245 F.3d 352, 362 (4th Cir. 2001).

In this case, we cannot say that the district court's finding that Digiovanni's written consent was involuntary is implausible. On the one hand, Digiovanni was in his late 50s, neither

too young nor too old, and the video demonstrates that he is reasonably intelligent. The encounter was in public and in broad daylight, Trooper Conner was the only officer on the scene, and his weapon was not drawn. *See United States v. Wilson*, 895 F.2d 168, 172 (4th Cir. 1990) (holding that the defendant's consent, which was given when the defendant shrugged his shoulders and raised his arms in response to a police officer's request to pat the defendant down, was voluntary because the police officer was dressed in plain clothes, made no threats, displayed no weapons, and asked for consent in public). Trooper Conner also returned Digiovanni's license and rental contract. *See Farrior*, 535 F.3d at 219 ("The fact that Officer Morris had returned Farrior's license and registration also strongly indicates that the encounter was consensual and that no seizure occurred within the meaning of the Fourth Amendment."). On the other hand, the district court was free to conclude that the seizure continued even though Trooper Conner used the magic buzz words "you are free to go," as such a statement is not "'talismanic'" or sufficient in and of itself to show a lack of custody." *United States v. Hargrove*, 625 F.3d 170, 180 (4th Cir. 2010).

Moreover, Trooper Conner's false implication that Digiovanni was bound by his earlier consent and his "hold on a second" statement also suggest that the seizure continued. While it is true that a consent obtained during an illegal detention may be voluntary, *Boone*, 245 F.3d at 362-63, we simply cannot say that it is implausible to conclude that Digiovanni's consent was involuntary, whether he still was seized or not. The false implication mentioned above and the "hold on a second" statement set this case apart and lend support to the plausible conclusion that a reasonable person would not have felt free to decline Trooper Conner's request to search the car. *See United States v. Sullivan*, 138 F.3d 126, 132 (4th Cir. 1998) (noting that a court must decide, given the totality of the circumstances, whether "a reasonable person in the suspect's position 'would have felt free to decline the officers' requests or otherwise terminate the encounter'") ((quoting

*Florida v. Bostick*, 501 U.S. 429, 438 (1991)); *cf. United States v. Molt*, 589 F.2d 1247, 1251-52 (3d Cir. 1978) (holding consent involuntary where agents misrepresented their statutory authority). This point is supported by the fact that Digiovanni took just five seconds to review and sign the form after he had received it, and by the fact that he was subjected to extensive questioning concerning drugs during an illegal seizure. The close proximity of Trooper Conner to Digiovanni, and Trooper Conner's authoritative demeanor further support the district court's finding. In sum, under the extremely deferential standard of review, we must reject the government's challenge to the district court's finding that Digiovanni's consent was involuntary.[5]

## III

For the reasons stated herein, the judgment of the district court is affirmed.

*AFFIRMED*

---

[5]Because we are affirming the district court's finding that Digiovanni's written consent was involuntary, we need not address whether a valid consent purged the taint between the illegal detention and the discovery of the evidence. *See Brown*, 422 U.S. at 603-04 (noting that the attenuation test includes the following factors: the time between illegality and acquisition of evidence; the presence of intervening circumstances; and the purpose and flagrancy of official misconduct); *Seidman*, 156 F.3d at 549-50 (applying attenuation test).