**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 12-4879**

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

HERBERT GREEN,

Defendant – Appellant.

Appeal from the United States District Court for the Western
District of Virginia, at Roanoke.    Glen E. Conrad, Chief
District Judge.  (7:11-cr-00057-GEC-1)

Argued: October 31, 2013          Decided: January 17, 2014

Before GREGORY, SHEDD, and KEENAN, Circuit Judges.

Affirmed by published opinion.   Judge Shedd wrote the opinion,
in which Judge Gregory and Judge Keenan joined.

**ARGUED:** Randy Virlin Cargill, OFFICE OF THE FEDERAL PUBLIC
DEFENDER, Roanoke, Virginia, for Appellant.    Thomas Ernest
Booth, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.,
for Appellee.   **ON BRIEF:** Larry W. Shelton, Federal Public
Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Roanoke,
Virginia, for Appellant.   Timothy J. Heaphy, United States
Attorney, Ashley B. Neese, Assistant United States Attorney,
OFFICE OF THE UNITED STATES ATTORNEY, Roanoke, Virginia; Mythili
Raman, Acting Assistant Attorney General, Denis J. McInerney,
Acting Deputy Assistant Attorney General, Criminal Division,

UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

———————

SHEDD, Circuit Judge:

A federal grand jury indicted Herbert Green on one count of possession with intent to distribute 500 grams or more of a mixture or substance containing cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B). Before trial, Green moved twice to suppress the cocaine, arguing that the police seized it in violation of the Fourth Amendment. The district court denied both motions, and Green entered a conditional plea of guilty to the charge against him, preserving the right to appeal the district court's denial of his suppression motions based on the scope and duration of the stop and the reliability of the drug-detection dog. The district court sentenced Green to 200 months in prison and 5 years of supervised release. For the reasons stated below, we affirm the district court's denial of Green's motions to suppress.

I.

In reviewing the denial of a motion to suppress, we review the district court's factual findings for clear error and its legal conclusions de novo. United States v. Black, 707 F.3d 531, 537 (4th Cir. 2013). We construe the evidence in the light most favorable to the government, as the prevailing party below. Id. at 534. The district court found the following facts, which the parties do not contest on appeal.

3

On the morning of March 17, 2011, Virginia State Police Trooper Daryl Johnson executed a traffic stop of Green's vehicle because the windows appeared to be excessively tinted and the license plate was partially obscured. Before activating his patrol car's blue lights at approximately 10:07:58, Trooper Johnson contacted Trooper Brian Dillon, who was driving a separate patrol car, and notified him of his location in case he needed assistance.

At 10:08:35, Trooper Johnson approached Green's vehicle and asked him for his driver's license and vehicle registration. Trooper Johnson explained that Green's license plate was partially obscured, in violation of Virginia law. He also asked Green about the window tint; Green responded that the windows were already tinted when he bought the car. Trooper Johnson later testified that Green appeared to be excessively nervous and that the vehicle contained a strong odor of air freshener and had a "lived-in look."

At 10:10:30, Trooper Johnson asked Green to accompany him to the patrol car so he could check Green's license and registration on his computer. Upon exiting the vehicle, Green mentioned that his lawyer had advised him not to get out of his car during traffic stops. Once inside the patrol car, Trooper Johnson asked Green why he had a lawyer, and Green responded that he was in the entertainment business. During this

4

conversation, Trooper Johnson began checking Green's license and registration.

At 10:11:20, Trooper Johnson radioed Trooper Dillon, who had parked some distance behind Trooper Johnson, and told him to "come on up." Trooper Johnson then asked Green about his itinerary. Green responded that he and his passenger were driving to Pittsburgh from Atlanta, where they had been performing shows. At 10:11:35, Trooper Johnson reiterated the reasons for the traffic stop.

At 10:13, Trooper Johnson's computer program responded to his inquiry, notifying him of a concealed weapons permit in Green's name and a protective order against him, both of which alerted Trooper Johnson to potential officer safety issues. At 10:14, dispatch told Trooper Johnson that the concealed weapons permit did not belong to Green but confirmed that Green had a protective order against him. Trooper Johnson and Green had a brief exchange about the protective order and the underlying facts, and Trooper Johnson requested additional information from dispatch. He again asked Green about his travel plans and the identity of his passenger. Green explained that the passenger was his recording artist and that they had been in Atlanta for eight days.

Between 10:15 and 10:16, Trooper Johnson told Green that he was going to check the tint on the vehicle's windows. Upon

5

exiting his patrol car, Trooper Johnson spoke with Trooper Dillon, who had arrived on the scene. At 10:16, Trooper Johnson approached the front passenger window of Green's vehicle and spoke with the passenger. The passenger informed Trooper Johnson that he had been in Atlanta with Green for two weeks, where he performed as an R&B singer. During this conversation, Trooper Johnson measured the window tint and found that it violated Virginia law. At 10:17, Trooper Johnson walked back to his patrol car and told Green that the window tint was illegal. Trooper Johnson then asked Green whether there were any illegal drugs in the vehicle. Green stated that there were not, but Trooper Johnson testified that Green began breathing very rapidly and appeared to be uncomfortable when Trooper Johnson questioned him about illegal drugs. At 10:17:49, Trooper Johnson requested a check of Green's criminal history from dispatch.

At 10:18, Trooper Johnson asked Green if he had ever been arrested. Green responded that he had "beat[en] up a few people," and that he was arrested for narcotics in the 1980s. Trooper Johnson also asked how long Green had lived in Pittsburgh. At 10:18:46, Trooper Johnson reiterated that the window tint was illegal.

At 10:19, Trooper Johnson left his patrol car to speak with Trooper Dillon, telling him that Green had "lawyered up" before getting out of his car, that Green was "dirty," and that Green

6

had a "history" but would not tell Trooper Johnson about it. He stated that he was checking Green's criminal history and asked Trooper Dillon to perform a free-air sniff of Green's vehicle using Trooper Dillon's drug-detection dog, Bono.

At 10:19:42, Trooper Johnson told Green that Trooper Dillon was going to conduct an exterior sweep of Green's vehicle with the dog and that he was waiting to hear back from dispatch about the protective order. Bono alerted to the vehicle's rear passenger panel and completed the free-air sniff at 10:21. When Trooper Johnson told Green that Bono had detected the presence of narcotics, Green stated that he did not want anyone to search the vehicle. Trooper Johnson explained that Bono's alert gave the officers probable cause for a search.

At 10:21:55, just after Bono completed the sniff, dispatch informed Trooper Johnson that Green's criminal history raised multiple officer safety issues and included charges for homicide, carrying concealed weapons, robbery, kidnapping, and terroristic threats. At 10:27:05, upon the arrival of a third officer, the troopers began searching the vehicle. They discovered a duffle bag containing over one kilogram of cocaine and approximately $7,000 in cash.

After a grand jury returned an indictment charging Green with possession with intent to distribute 500 grams or more of cocaine, Green moved to suppress the evidence found in the

vehicle, arguing that the traffic stop was unreasonable in its scope and duration and that the delay was not justified by reasonable suspicion of criminal activity. The district court denied Green's motion, holding that Trooper Johnson did not unreasonably or unnecessarily prolong Green's detention and that Green was lawfully seized for the traffic violation at the time the free-air sniff occurred. United States v. Green, 2011 WL 6439387, at *7 (W.D. Va. Dec. 21, 2011).

Green then filed a second motion to suppress, arguing that Bono's field performance was so poor that his positive alert did not provide probable cause to search the vehicle. The district court denied this motion, concluding that "the record is sufficient to establish Bono's reliability and, thus, that his positive alert provided probable cause to search the defendant's vehicle." United States v. Green, 2012 WL 2924055, at *5 (W.D. Va. June 28, 2012). On appeal, Green argues that the district court erred in denying both motions to suppress.

## II.

Green argues that the district court erred in denying his first motion to suppress because the scope and duration of the detention were unreasonable, in violation of his Fourth Amendment rights. For the following reasons, we reject this contention.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The stop of a vehicle by the police amounts to a seizure within the meaning of the Fourth Amendment. Whren v. United States, 517 U.S. 806, 809-10 (1996).

A lawful traffic stop "begins when a vehicle is pulled over for investigation of a traffic violation" and ends "when the police have no further need to control the scene, and inform the driver and passengers they are free to leave." Arizona v. Johnson, 555 U.S. 323, 333 (2009). Because an ordinary traffic stop is more analogous to an investigative detention than a custodial arrest, we analyze the propriety of a traffic stop using the dual inquiry announced in the Supreme Court's holding in Terry v. Ohio, 392 U.S. 1, 19-20 (1968). United States v. Rusher, 966 F.2d 868, 875 (4th Cir. 1992). Accordingly, we consider first whether the officer's actions were justified at their inception and second whether his subsequent actions were reasonably related in scope to the circumstances that justified the stop. Id. (quoting Terry, 392 U.S. at 20).

Because Green does not contest that the traffic stop in this case was justified at its inception, we proceed directly to

9

the second prong of the Terry analysis.[1] Green argues that the 14-minute period of detention between the initial stop and the alert by the drug-detection dog was not reasonably related in scope to the circumstances that justified the stop. Green cites to our decision in United States v. Digiovanni, 650 F.3d 498 (4th Cir. 2011), and argues that the scope and duration of the detention were unreasonable because Trooper Johnson used the traffic stop to embark on an unlawful drug investigation.

In Digiovanni, a police officer initiated a traffic stop after observing Digiovanni traveling too close to the car in front of him, asked Digiovanni for his driver's license and vehicle registration, and then "embarked on a sustained investigation into the presence of drugs, instead of either completing the warning ticket or beginning the driver's license

---

[1] Because "[o]bserving a traffic violation provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop," United States v. Branch, 537 F.3d 328, 335 (4th Cir. 2008), there is ample support for the conclusion that this stop was justified at its inception. Trooper Johnson testified that he first observed the tinted windows on Green's vehicle, which appeared to violate Virginia law. He further explained that he noticed that the license plate was partially obscured when he began to call the plate into dispatch, but the illegally tinted windows alone were sufficient to justify the stop. See Va. Code Ann. § 46.2-1052(C)(2) ("No sun-shading or tinting films may be applied or affixed to the front side windows of any motor vehicle operated on the highways of this Commonwealth that reduce total light transmittance of such window to less than 50 percent[.]").

10

check." Id. at 501-02, 509-10. The officer did not initiate the driver's license check until after he questioned Digiovanni for approximately 10 minutes and returned to his patrol car to radio for back-up assistance. Id. at 510. Approximately 15 minutes into the stop, the officer returned Digiovanni's license and issued him a warning ticket. Id. The officer then immediately returned to the subject of drugs and requested to search Digiovanni's vehicle. Id. at 504, 510. We held that the search violated Digiovanni's Fourth Amendment rights because the record made it "clear that at just about every turn [the officer] was conducting a drug investigation instead of a traffic infraction investigation. Indeed, the bulk of the encounter between [the officer] and Digiovanni involved a drug investigation . . . ." Id. at 510.

As we explained in Digiovanni, a traffic stop must be limited in both scope and duration. Id. at 507. With regard to scope, the officer's investigative methods should be "the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." Id. However, questions unrelated to the purpose of the traffic stop do not necessarily run afoul of the scope component of the Terry inquiry. See id.

With regard to duration, we determine "whether the police diligently pursued a means of investigation that was likely to

11

confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." Id. (internal quotation marks omitted). Although the maximum acceptable length of a routine traffic stop cannot be stated with mathematical precision, Branch, 537 F.3d at 336, a stop may become unlawful if "it is prolonged beyond the time reasonably required to complete [its] mission," Illinois v. Caballes, 543 U.S. 405, 407 (2005). The reasonableness of a stop turns on whether the officer's overall course of action, "viewed objectively and in its totality, is reasonably directed toward the proper ends of the stop." Digiovanni, 650 F.3d at 508.

During a routine traffic stop, an officer "may request a driver's license and vehicle registration, run a computer check, and issue a citation." Rusher, 966 F.2d at 876. An officer may also conduct an exterior dog sniff of the vehicle, as long as it is "performed within the time reasonably required to issue a traffic citation." Branch, 537 F.3d at 335 (internal quotation marks omitted). To prolong a traffic stop beyond the scope of a routine stop, the officer must have either the driver's consent or a reasonable suspicion of illegal activity. Id. at 336. However, where a delay in conducting a dog sniff can be characterized as de minimis under the totality of the circumstances, the delay does not violate the defendant's Fourth

12

Amendment rights. See United States v. Farrior, 535 F.3d 210, 220 (4th Cir. 2008).

Applying this framework, we conclude that the district court correctly held that the traffic stop at issue was reasonable in scope and duration and that Green was lawfully seized for a traffic violation when the dog sniff occurred. After initiating the traffic stop, Trooper Johnson promptly informed Green that it appeared his window tint and partially obscured license plate violated Virginia law, and he asked Green for his driver's license and vehicle registration. Trooper Johnson asked Green to accompany him to the patrol car and immediately began verifying the documents on his computer and through his dispatcher. While waiting approximately three minutes for a response, Trooper Johnson addressed the grounds for the traffic stop and questioned Green about his travel plans and his lawyer.

When dispatch informed Trooper Johnson that Green had a protective order against him, Trooper Johnson requested additional information because, as he explained at the suppression hearing, the existence of a protective order raises officer safety concerns.[2] Trooper Johnson checked the window tint

---

[2] Trooper Johnson's computer program also informed him that Green had a concealed weapons permit, but dispatch promptly confirmed that the permit did not belong to Green. Although
(Continued)

13

on Green's vehicle and confirmed that it violated Virginia law while he waited for a response about the protective order. Trooper Johnson did not immediately issue a citation, but rather called dispatch and requested a check of Green's criminal history. Trooper Johnson then waited approximately four minutes for a response. During that time, Bono completed the exterior sniff of Green's vehicle.

Trooper Johnson's brief questioning about matters unrelated to the traffic violations did not run afoul of the scope component of Terry's second prong. See Johnson, 555 U.S. at 333 ("An officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop."); Digiovanni, 650 F.3d at 507. Although the criminal history check extended the duration of the traffic stop, the totality of the circumstances demonstrates that Trooper Johnson diligently pursued the purposes of the stop. See Digiovanni, 650 F.3d at 508.

Trooper Johnson requested the criminal history check out of concern for officer safety. See id. ("The diligence calculus

---

concealed weapons permits do signal officer safety concerns, the computer's initial alert does not factor into our analysis.

14

includes an examination of . . . whether the unrelated questioning was conducted out of concern for officer safety."). He did not learn that Green had a protective order against him until after he made the initial inquiry into Green's driver's license and vehicle registration, and he requested the criminal history check before receiving additional information about the protective order. Further, Trooper Johnson testified that Green's demeanor and behavior throughout the traffic stop in conjunction with the protective order raised concerns about officer safety. Given these facts, Trooper Johnson did not act unreasonably or unnecessarily prolong Green's detention.

Finally, the criminal history check added just four minutes to the traffic stop. Under the circumstances, we are convinced that such a delay, at most, amounted to a de minimis intrusion on Green's liberty interest and thus did not constitute a violation of his Fourth Amendment rights. See Farrior, 535 F.3d at 220. We therefore hold that the district court correctly denied Green's first suppression motion.

### III.

Green also argues that the district court erred in denying his second suppression motion because Bono's track record in the field is not sufficiently reliable for his positive alert to provide probable cause to search Green's vehicle. For the following reasons, we reject this contention.

15

Probable cause is "a flexible, common-sense standard." Texas v. Brown, 460 U.S. 730, 742 (1983) (plurality opinion). It requires only that "the facts available to the officer would warrant a man of reasonable caution in the belief that certain items may be contraband . . . or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false." Id. (internal quotation marks and citations omitted). Probable cause to conduct a search based on a drug-detection dog's alert exists when the totality of the circumstances, "viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." Florida v. Harris, 133 S. Ct. 1050, 1058 (2013).

After the district court denied Green's second suppression motion, the Supreme Court in Harris addressed how courts should determine whether an alert from a drug-detection dog provides probable cause to search a vehicle when the defendant has challenged the dog's reliability. 133 S. Ct. at 1053. In that case, Harris moved to suppress evidence found in his truck during a search based on a drug-detection dog's alert, arguing that the dog was unreliable and thus his alert did not give the officer probable cause. Id. at 1054. Harris argued that the alert by the dog was unreliable because on both occasions that the dog alerted on his vehicle, the officers were unable to find

16

any substances that the dog was trained to detect. Id. at 1058-59. The Court rejected Harris' contention, holding that "evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert," and based on this evidence, "a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search." Id. at 1057. The Court explained:

> If a dog on patrol fails to alert to a car containing drugs, the mistake usually will go undetected because the officer will not initiate a search. Field data thus may not capture a dog's false negatives. Conversely (and more relevant here), if the dog alerts to a car in which the officer finds no narcotics, the dog may not have made a mistake at all. The dog may have detected substances that were too well hidden or present in quantities too small for the officer to locate. Or the dog may have smelled the residual odor of drugs previously in the vehicle or on the driver's person. Field data thus may markedly overstate a dog's real false positives. By contrast, those inaccuracies—in either direction—do not taint records of a dog's performance in standard training and certification settings. There, the designers of an assessment know where drugs are hidden and where they are not—and so where a dog should alert and where he should not.

Id. at 1056-57. Based on this reasoning, the Court held that "in most cases," a drug-detection dog's field performance has "relatively limited import" and that the better measure of a dog's reliability comes from his performance in controlled testing environments. Id.

17

The Court explained that a defendant may challenge the government's evidence of a dog's reliability by, for example, contesting the adequacy of the drug-detection certification or training program or examining how the dog or handler performed in the program. Id. at 1057. The Court also stated that evidence of the dog's or handler's previous performance in the field "may sometimes be relevant," but it warned against "inferring too much from the failure of a dog's alert to lead to drugs." Id. at 1057, 1059. In Harris, the State introduced substantial evidence of the drug-detection dog's training and his proficiency in finding drugs. Id. at 1058. Harris responded only that the dog's field performance showed that his alert was unreliable. See id. The Court held that because the State had "produced proof from controlled settings that a dog performs reliably in detecting drugs," and Harris had failed to undermine that showing by challenging some aspect of the dog's training, the officer had probable cause to search the defendant's truck. Id. at 1058-59.

Applying this framework, we conclude that the district court correctly held that Bono was sufficiently reliable and that his positive alert provided probable cause for the search of Green's vehicle. Green presented Bono's field performance reports, which showed that drugs were found only 22 of the 85 times that Bono had alerted in the field before his alert on Green's vehicle. He argues that, based on this success rate in

18

the field of 25.88%, no reasonably prudent person would think that a search based on Bono's alert would reveal contraband or evidence of a crime. Although the field performance reports show that Bono's alert in an uncontrolled environment does not always result in the discovery of drugs, the district court found that Bono's success rate rises from 25.88 to 43% after factoring in the cases in which Bono's alert did not lead to the discovery of drugs but officers found direct evidence that drugs or drug users had recently been in the vehicle.[3] Moreover, the district court correctly determined that, when taking Bono's training and certification record into account, the record is sufficient to establish Bono's reliability.

As in Harris, the government presented extensive evidence of Bono's reliable performance in training and certification programs, and Green has not introduced any evidence to undermine

---

[3] Green argues that these false positives should not be considered because the probable cause inquiry focuses on the presence of drugs, not the mere odor of drugs. He contends that when a drug-detection dog alerts and no drugs are found, that dog has not predicted the presence of drugs. But Green misapprehends the concept of probable cause. The calculus of probable cause deals with the possibility, not the guarantee, of criminal conduct. The presence of drug odors is certainly relevant to that issue. Moreover, the Supreme Court explained in Harris that "[a] well-trained drug-detection dog should alert to such [residual] odors; his response to them might appear a mistake, but in fact it is not." 133 S. Ct. at 1059. These false positive cases are correctly factored into Bono's success rate because he alerted to the odor of drugs as he was trained.

that showing. Trooper Dillon, Bono's handler, began working with Bono in 2007, when the pair completed a thirteen-week drug-detection course at the Virginia State Police training academy. After completing the course, Bono passed a certification test before going out into the field with Trooper Dillon. To keep their certification current, Trooper Dillon and Bono complete four hours of training each week and 20 hours of in-service training each month. The pair has been recertified as a team every year since 2007, and Bono has maintained a 100% success rate in controlled testing environments. Trooper Dillon testified that in controlled testing Bono has never failed and has only alerted on vehicles containing drugs or the odor of drugs.

The government also presented testimony from Senior Trooper Sydney Scott Settle, a canine trainer for the Virginia State Police, who confirmed that Bono has passed all of his annual certification tests. Settle testified, based on his experience training Bono, that Bono is a reliable drug-detection dog.

When considering Bono's field performance records in conjunction with his degree of training, his performance during training and recertification exercises, and his evaluations by Troopers Dillon and Settle, the totality of the circumstances establish Bono's reliability in detecting drugs. Because the government has established Bono's reliability and Green has

failed to undermine that showing, we agree with the district court that Troopers Johnson and Dillon had probable cause to search Green's vehicle. Accordingly, we hold that the district court correctly denied Green's second motion to suppress.

## IV.

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED