PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

       *Plaintiff-Appellee,*

v.

SAUL GUIJON-ORTIZ, a/k/a Daniel
Gaitan, a/k/a Saul Ortiz-Guijon,
a/k/a Daniel Juatan,

       *Defendant-Appellant.*

No. 10-4518

Appeal from the United States District Court
for the Southern District of West Virginia, at Charleston.
John T. Copenhaver, Jr., District Judge.
(2:09-cr-00131-1)

Argued: September 23, 2011

Decided: November 10, 2011

Before GREGORY and DAVIS, Circuit Judges, and
Damon J. KEITH, Senior Circuit Judge of the United States
Court of Appeals for the Sixth Circuit,
sitting by designation.

Affirmed by published opinion. Judge Davis wrote the opinion, in which Judge Gregory and Senior Judge Keith joined.

**COUNSEL**

**ARGUED:** Jonathan D. Byrne, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charleston, West Virginia, for Appellant. Erik S. Goes, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, West Virginia, for Appellee. **ON BRIEF:** Mary Lou Newberger, Federal Public Defender, George H. Lancaster, Jr., Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charleston, West Virginia, for Appellant. R. Booth Goodwin II, United States Attorney, Charleston, West Virginia, for Appellee.

---

**OPINION**

DAVIS, Circuit Judge:

Saul Guijon-Ortiz appeals his conviction for illegal reentry after deportation, in violation of 8 U.S.C. § 1326(a), (b)(2).

Guijon-Ortiz was a back-seat passenger in a pickup truck during a routine traffic stop. After the officer asked him for identification, Guijon-Ortiz provided a fraudulently made Lawful Permanent Resident Identification Card that contained his photograph. The alien registration number ("A-number") on the card did not match the name on the card. The officer learned of the mismatch when he called the local office of the Bureau of Immigration and Customs Enforcement ("ICE") and inquired into the validity of the ID card. Guijon-Ortiz argues that during the time it took the officer to call ICE, he was subjected to an unconstitutional seizure, because calling ICE unlawfully prolonged the stop. Thus, he appeals the district court's denial of his motion to suppress his fingerprints, which were obtained when he was later transported to an ICE office and questioned. Because we conclude, under the totality of the circumstances, that the officer's call to ICE did not unreasonably prolong the seizure, we affirm.

## I.

## A.

On the afternoon of April 29, 2009, Cpl. Fred Flowers of the Kanawha County, West Virginia Sheriff's Office was assigned to highway patrol just outside Charleston, West Virginia. With his radar, he clocked a passing Dodge pickup truck at 66 miles per hour on a stretch of highway with a posted limit of 65 miles per hour. Flowers testified that the driver braked when he saw Flowers with his radar gun, and that the driver and front passenger turned their heads down (away from Flowers) as they passed. Flowers pulled off the shoulder and began to follow the truck.

Flowers testified that the truck slowed to 55 miles per hour and, when he attempted to pull up alongside it, it would either speed up or slow down. Flowers then began to follow at a distance. He observed that the truck had a Georgia license plate and saw the truck "cross over into the emergency lane several times." J.A. 27. He stopped the vehicle because "[i]t was giving indicators of someone probably impaired or doing suspicious activity." J.A. 28. At 2:11 p.m., Flowers pulled the truck over.

There were three people in the truck. As Flowers would eventually learn, the driver was Juan Lopez-Villafuerte, the front-seat passenger was Juan's brother, Noe Lopez-Villafuerte, and the back-seat passenger was Guijon-Ortiz, a close friend of both Juan and Noe who also worked with Juan for a gas company. The three men had been in Charleston to buy shoes, and were returning to the hotel where they were living at the time.

Upon stopping the truck, as Juan testified, Flowers told him that he had observed the truck crossing onto the shoulder, and that "when you go on the line, . . . it could be because you are under the influence or you could have been drinking alcohol."

J.A. 130. Flowers asked Juan for his driver's license, the vehicle's registration, and proof of insurance. He also asked for identification from the front- and back-seat passengers. Flowers testified that he "frequently" asks all occupants of a vehicle to provide identification, in order to "make sure they are not wanted out of another state or here locally in West Virginia." J.A. 29. The two men in the front seat complied, handing him Georgia identification cards, but Guijon-Ortiz did nothing. Flowers then asked Juan if Guijon-Ortiz spoke English; Juan replied that he did not. Flowers asked Juan to repeat the request in Spanish, which he did. At that point, Guijon-Ortiz handed Flowers a Lawful Permanent Resident Card ("LPR card" or "green card") in the name of Daniel Gaitan (the "Gaitan ID").[1] Flowers testified that Guijon-Ortiz appeared "very nervous" and "was shaking" as he did so. J.A. 32.

Flowers then returned to his patrol car. He checked the driver's license and the vehicle's registration, and they both came back as valid. He contacted his headquarters and asked them to search for outstanding arrest warrants for Juan, Noe and "Daniel Gaitan." Someone at Flowers's headquarters entered the names into the National Crime Information Center ("NCIC") database. "Within 30 seconds," Flowers was informed that there were no outstanding warrants for the three individuals. J.A. 33, 46.

Flowers did not proceed to issue a citation for speeding or crossing onto the shoulder, however. Nor did he return the ID cards and allow the three to go on their way. Instead, he decided to call ICE "[j]ust to verify the status of the . . . permanent resident card." J.A. 33. Flowers was not asked and did not explain at the suppression hearing whether (a) he suspected the Gaitan ID was false or altered, or belonged to someone else; (b) he suspected that, regardless of the validity

---

[1]There is a minor discrepancy in the record in the spelling of the name on the card, but the discrepancy has no effect on the issues presented.

of the ID, the defendant or one of the others might have been in the country unlawfully; (c) he called simply as a matter of routine, because he is accustomed to checking the validity of ID cards and (presumably, because the record does not indicate) the only way (or the easiest way) to check the validity of an LPR card is to call ICE; or (d) he simply had a hunch. The only evidence that might explain Flowers's decision to call ICE was that, when the defendant handed Flowers the Gaitan ID, the defendant appeared "very nervous, was shaking as he was handing out the ID." J.A. 32. In any event, he called ICE to verify the validity of the ID the defendant had handed to him, which also meant he was checking the immigration status of "Daniel Gaitan."

Flowers did not have the phone number for ICE, so he called his headquarters and asked to be transferred to the local ICE office, where he spoke with Special Agent Gary Hilton. Hilton testified that he received Flowers's call at approximately 2:30 p.m., at which point Flowers explained that a passenger had presented an LPR card during a traffic stop and asked that he "run the name and number to confirm that it was issued to that person." J.A. 59. Flowers gave Hilton the name and number on the Gaitan ID, which Hilton said he would "verify." J.A. 34. Hilton put Flowers on hold for "[a] few minutes" while he ran the number through the Central Index System, which tracks A-numbers when they are assigned to people. J.A. 34. Hilton came back on the line, and asked Flowers to repeat the name and number. Hilton then informed Flowers that the A-number did not match that name. This "led [Hilton] to believe that the number was not actually his and that card wouldn't be his." J.A. 60. Upon learning of the mismatch, Flowers had Hilton run Juan's and Noe's names through the Central Index System as well. The search showed that they were a naturalized U.S. citizen and a lawful permanent resident, respectively.

According to Flowers, it took "[j]ust a few minutes" for him to contact headquarters, for headquarters to run the names

through the NCIC database and inform Flowers that there were no outstanding warrants, then for Flowers to call ICE, and for Hilton to run two searches of its database and inform Flowers that the information on the Gaitan ID did not match the ICE database. J.A. 33-34. Because the warrant check took just 30 seconds, it appears from the record that most of those "few minutes" were spent on the phone waiting for Hilton to verify the validity of the Gaitan ID.

After Hilton expressed his belief that the Gaitan ID was invalid, he asked Flowers to put the defendant on the phone, "to verify his name and who he was, [and to] see if he was in the country legally or not." J.A. 60. Because Flowers was in an area with limited cell service, his cell phone only worked when plugged into a "cradle" in the patrol car. J.A. 35. So Flowers returned to the truck, had Guijon-Ortiz exit the truck and walk back to the passenger side of the patrol car, and handed the phone to Guijon-Ortiz. When Hilton realized he could not communicate with Guijon-Ortiz in English, he put an ICE agent on the phone who knew some Spanish, Agent Crystal Beveridge. Guijon-Ortiz admitted to Beveridge that he did not have a green card or other papers authorizing him to be in the United States, but he continued to state that his name was Daniel Gaitan. From these admissions, Beveridge concluded that there was probable cause to believe Guijon-Ortiz "was illegally in the United States." J.A. 94. According to Beveridge, this conversation lasted "less than five minutes." J.A. 94. Beveridge then explained to Hilton that the defendant had admitted being in the country illegally.

Hilton then spoke with Flowers again and told him that because the A-number did not match the name on the card, and because the defendant had admitted "being in the country illegally, [they] had probable cause to believe he was an illegal alien." J.A. 63. Hilton then asked Flowers to bring Guijon-Ortiz to the ICE office. Flowers returned to the stopped vehicle and asked the driver to step out of the truck. Flowers asked the driver whether he had been drinking; the driver

responded that he had not. Flowers also observed that there were "no odors of alcoholic beverages on his breath or anything like that." J.A. 38. At that point, he concluded that the driver had not been drinking. He then searched the rear of the vehicle for "anything that was criminal." J.A. 51. He decided not to issue a ticket to the driver because, although he had been concerned the driver was "probably impaired" from "the way he was driving," after speaking with him Flowers was reassured that he had not been drinking. J.A. 38. He then informed Juan and Noe that he was taking Guijon-Ortiz to the ICE office, and then gave them permission to leave. He gave Juan the phone number for the ICE office, and ensured that Guijon-Ortiz had contact information for Juan and/or Noe, so he could contact them to pick him up if necessary. He placed Guijon-Ortiz in handcuffs with his hands in front, put him in the rear of the patrol car, and then took him to the ICE office, where they arrived at approximately 3:00 p.m. According to Flowers, the trip to the ICE office took twelve to fifteen minutes; by the time they arrived at the office, approximately fifteen to twenty minutes had passed from when Flowers had ended the phone conversation with Hilton. Flowers stayed at the ICE office for just a few minutes to provide background information on the traffic stop, and then left.

In the ICE office, Hilton took Guijon-Ortiz to a processing desk and called an interpreter line. Through the interpreter, Hilton asked a series of questions to gather biographical information. Guijon-Ortiz continued to state that his name was Daniel Gaitan.

Hilton then took the defendant's fingerprints "to run through the computer system to see if he ha[d] ever been encountered by Immigration before." J.A. 65. He ran the fingerprints through a program called IDENT. After a few minutes, he learned the appellant's true name was Saul Guijon-Ortiz. After further investigation, he also learned that in 2007 Guijon-Ortiz was convicted in Georgia state court for the felony offense of possession with intent to distribute metham-

phetamine, for which he was sentenced to three months of imprisonment and six years and nine months of probation. After serving the imprisonment portion of the sentence, he was arrested by ICE and deported. With this information, Hilton then began the paperwork necessary to administratively reinstate the prior order of deportation.

Agent Patrick Kelly, another ICE agent, arrived at the ICE office at approximately 4:30 p.m., and Hilton handed responsibility for the case over to him. Kelly attempted to contact the ICE liaison at the U.S. Attorney's Office "to determine if prosecution would be accepted," but he was unable to reach the liaison. J.A. 98. Kelly then completed the paperwork Hilton had begun to reinstate the prior order of deportation. At approximately 5:15 p.m. Kelly reviewed with and served upon Guijon-Ortiz the necessary paperwork: a Notice of Intent/Decision to Reinstate Prior Order, Warning to Alien Ordered Removed or Deported, Warrant of Removal/Deportation, and Warrant for Arrest of Alien. Kelly then took a sworn statement from Guijon-Ortiz in which he admitted that he was an illegal alien. Kelly then took a *Miranda* form, reviewed those rights with Guijon-Ortiz, and took another similar statement. Guijon-Ortiz was then detained pending deportation.

B.

Guijon-Ortiz was indicted on May 20, 2009 for illegal reentry under 8 U.S.C. § 1326(a), (b)(2). He moved to suppress all evidence obtained as a result of the traffic stop, and the district court held a suppression hearing on October 1, 2009. Flowers, Hilton, Beveridge, Kelly, Juan, and Noe each testified. After the hearing, the government agreed not to seek the admission of the defendant's statements made at the ICE office before he was given the *Miranda* warnings. Thus the evidence the government sought to admit and the defendant sought to suppress was (1) his roadside admission that he was in the country illegally; (2) the biographical information gath-

ered at the ICE office; (3) the fingerprints taken at the ICE office; (4) his post-*Miranda* statements; and (5) any information in the defendant's immigration file obtained after running the fingerprints that showed he had previously been convicted of a felony.

The district court denied the motion to suppress in a memorandum opinion and order filed on November 25, 2009. *United States v. Guijon-Ortiz*, No. 2:09-00131, 2009 WL 4545104 (S.D. W. Va. Nov. 25, 2009). The court concluded there were two alternative reasons the seizure of the defendant was lawful through at least the time Flowers learned that the name and number on the Gaitan ID did not match. First, the court found that Flowers did not impermissibly prolong the stop because "Flowers would . . . have been permitted the time necessary to issue the citation for speeding," and his decision to instead "devote[ ] that time to the ICE check" was "a constitutionally permissible choice." *Guijon-Ortiz*, 2009 WL 4545104, at *3. Second, the court held that, if reasonable suspicion was required to take the time to call ICE, reasonable suspicion did exist, based on three factors: (1) "Cpl. Flowers executed the vehicle stop after observing erratic driving. This was not the case of a simple broken tail light or an expired license plate"; (2) "[W]hen defendant was asked for identification, he failed to acknowledge the request. Assuming that failure was the product of a language barrier, Cpl. Flowers was not required to accept at face value the contention that defendant was unable to converse in English"; (3) Guijon-Ortiz was "very nervous, indeed shaking" when he handed Flowers his LPR Card. *Id.* at *4. The district court also held that the "booking exception" to the exclusionary rule applied to both the fingerprinting and pre-*Miranda* questioning at the ICE office, finding that "[t]he evidence was obtained for, and was motivated solely by, the administrative purpose of removal, including the reinstatement of the defendant's prior order or deportation." *Id.* at *6. The court noted that Hilton had testified that "illegal reentry cases are generally pursued administratively rather than criminally." *Id.*

After his suppression motion was denied, Guijon-Ortiz pled guilty on the condition that he could appeal the suppression ruling, and timely appealed.

## II.

In reviewing a district court's denial of a motion to suppress, we review the district court's factual findings for clear error and its legal conclusions de novo. *United States v. Perkins*, 363 F.3d 317, 320 (4th Cir. 2004).

## A.

On appeal, Guijon-Ortiz argues the district court erred in refusing to suppress evidence "of Guijon-Ortiz's identity and immigration status." Appellant's Br. at 1. He argues that once Flowers learned there were no outstanding warrants for the three individuals, the Fourth Amendment required that Flowers either conclude the traffic stop or issue a citation for the traffic violation he had observed; taking the time to call ICE required either the driver's consent or reasonable suspicion that illegal activity was afoot, neither of which Flowers had. Because the continued seizure of the vehicle and its passengers was unlawful, and because the evidence of Guijon-Ortiz's identity (including his fingerprints) was the fruit of that unlawful seizure, he argues, they had to be suppressed.

Guijon-Ortiz does not challenge the district court's conclusion that the initial stop of the vehicle was lawful. *See id.* at 14. Nor does he challenge the officer's authority to ask Guijon-Ortiz for identification, or the voluntariness of the defendant's decision to hand over the fraudulent LPR card in response to the request for identification.[2]

---

[2]Because the request was for identification, we need not, and therefore we do not, address whether Flowers could have permissibly asked Guijon-Ortiz for proof of his immigration status.

Moreover, Guijon-Ortiz does not argue, nor could he, that once Flowers learned from ICE that the number on the Gaitan ID did not match the name Daniel Gaitan, the Fourth Amendment required Flowers to let the vehicle and its passengers, including Guijon-Ortiz, go on their way. At that point, Flowers had at least reasonable suspicion that Guijon-Ortiz's presence in the country was unlawful.[3] Thus, the question presented is a narrow one: Once the officer learned that there were no outstanding warrants, and having been provided an LPR card by the defendant as identification, was he permitted to then call ICE—a call that took some portion of "a few minutes"—to verify the validity of the LPR card?[4]

---

[3]Although we need not decide the issue, Flowers may even have had probable cause that Guijon-Ortiz violated 18 U.S.C. § 1546(a), which a person violates if he or she "utters, uses, attempts to use, possesses, obtains, accepts, or receives" an "immigrant or nonimmigrant visa, permit, border crossing card, alien registration receipt card, or other document prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States, knowing it to be forged, counterfeited, altered, or falsely made, or to have been procured by means of any false claim or statement, or to have been otherwise procured by fraud or unlawfully obtained." *See* W. Va. Code § 62-10-9 (authorizing sheriffs and their deputies "to make arrests without warrant for all violations of any of the criminal laws of the United States, or of this state, when committed in their presence"); *Devenpeck v. Alford*, 543 U.S. 146 (2004) (holding that so long as "the reasonable conclusion to be drawn from the facts known to [an] arresting officer at the time of the arrest" was that there was "probable cause to believe that a criminal offense has been or is being committed," a warrantless arrest is lawful, even if the offense for which probable cause existed was not "actually invoked at the time of arrest").

[4]Even if it could be said that Guijon-Ortiz's original delivery of the Gaitan ID to Deputy Flowers was with Guijon-Ortiz's voluntary consent, under *Florida v. Bostick*, 501 U.S. 429 (1991), Flowers's retention of the Gaitan ID after confirming the absence of a warrant almost certainly vitiated any such consent with respect to the prolonged seizure. In *Bostick*, the Court explained that an encounter with police is "consensual"—and therefore not a "seizure"—if "a reasonable person would feel free to disregard the police and go about his business." *Id.* at 434. In *United States v. Meikle*, 407 F.3d 670 (4th Cir. 2005), we explained, "If a reasonable person

### B.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The "[t]emporary detention of individuals during the stop of an automobile by police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." *Whren v. United States*, 517 U.S. 806, 809-10 (1996). Because an ordinary traffic stop is "a limited seizure more like an investigative detention than a custodial arrest," we employ the Supreme Court's analysis for investigative detention used in *Terry v. Ohio*, 392 U.S. 1 (1968), to determine the limits of police conduct in routine traffic stops. *United States v. Rusher*, 966 F.2d 868, 875 (4th Cir. 1992).

Under *Terry*'s "dual inquiry," after asking whether the officer's action was "justified at its inception," *Rusher*, 966 F.2d at 875, we ask whether the continued stop was "sufficiently

---

would have felt free to decline the officer's request or otherwise terminate the encounter, and the suspect freely gives consent to search *at this point*, there is no need to reach the issue of whether the initial stop was permissible under *Terry*." *Id.* at 672 (emphasis added). In *United States v. Sullivan*, 138 F.3d 126 (4th Cir. 1998), for example, we found that an officer's "brief dialogue" on a matter unrelated to the justification for the stop was justified as consensual. But we emphasized that the officer "did not question Sullivan until *after he had returned Sullivan's license and registration*, thus ending the traffic stop and affording Sullivan the right to depart." *Id.* at 133. Similarly, in *United States v. Farrior*, 535 F.3d 210 (4th Cir. 2008), an officer's unrelated questioning was consensual because the officer "returned his license and registration, orally warned him to fix his tag light, and told him that he was free to go." *Id.* at 218; *see also United States v. Pruitt*, 174 F.3d 1215, 1220 (11th Cir. 1999) ("The officer had not returned [the defendant's] license at the time he asked about guns and drugs, so further questioning unrelated to the initial stop must have been supported by an objectively reasonable suspicion of illegal activity."). In the view we take of this case, we need not resolve this issue.

limited in scope and duration to satisfy the conditions of an investigative seizure." *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion). With regard to scope, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Id.* With regard to duration, although the reasonable duration of a traffic stop "cannot be stated with mathematical precision," *United States v. Branch*, 537 F.3d 328, 336 (4th Cir. 2008), a stop may become "unlawful if it is prolonged beyond the time reasonably required to complete [its] mission." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). Thus, we evaluate "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 686 (1985). To prolong a traffic stop "beyond the scope of a routine traffic stop," an officer "must possess a justification for doing so other than the initial traffic violation that prompted the stop in the first place." *Branch*, 537 F.3d at 336. This requires "either the driver's consent or a 'reasonable suspicion' that illegal activity is afoot." *Id.*

Although the scope and duration components of *Terry*'s second prong require highly fact-specific inquiries, the cases make possible some generalizations. When a police officer lawfully detains a vehicle, "police diligence involves requesting a driver's license and vehicle registration, running a computer check, and issuing a ticket." *United States v. Digiovanni*, 650 F.3d 498, 507 (4th Cir. 2011). The officer may also, "in the interest of personal safety," request that the passengers in the vehicle provide identification, at least so long as the request does not prolong the seizure. *United States v. Soriano-Jarquin*, 492 F.3d 495, 500-01 (4th Cir. 2007).[5]

---

[5]We note, however, that our opinion in *Soriano-Jarquin* is limited to whether an officer's *request* for a passenger's identification violates the Fourth Amendment. Just as the consequences of a passenger's *refusal* to provide identification are not presented here, because the defendant

Similarly, the officer may "inquir[e] into matters unrelated to the justification for the traffic stop," *Arizona v. Johnson*, 555 U.S. 323, ___, 129 S. Ct. 781, 788 (2009), and may take other actions that do not constitute "searches" within the meaning of the Fourth Amendment, such as conducting a dog-sniff of the vehicle, *Caballes*, 543 U.S. at 409, but again only "so long as those inquiries [or other actions] do not measurably extend the duration of the stop." *Johnson*, 129 S. Ct. at 788.

Strictly speaking, the scope and duration inquiries under *Terry*'s second prong are distinct. They become intertwined, however, in cases where, as here, the actions a defendant argues exceeded the scope of the stop necessarily also extended its duration. This raises the following question: Under what circumstances, if ever, may an officer prolong a traffic stop to investigate matters unrelated to the justification for the stop and without reasonable suspicion, whether through questioning or other means?[6]

---

handed over the Gaitan ID immediately after the driver translated the request, the consequences of such a refusal were not at issue in *Soriano-Jarquin*. *See* 492 F.3d at 497 (noting that immediately after the passengers indicated they did not have identification, the officer asked the driver whether the passengers were undocumented immigrants, and the driver nodded).

[6]This question was not at issue in *Johnson* or its predecessor, *Muehler v. Mena*, 544 U.S. 93 (2005), because in both cases, the unrelated questioning did not extend the seizures. In *Muehler*, officers were executing a search warrant of the defendant's home that authorized a search for "deadly weapons and evidence of gang membership," among other things. 544 U.S. at 95-96. While some officers were searching the house, a different officer questioned the defendant about her immigration status, though there was no reasonable suspicion she had committed an immigration violation. The Court held that because "the Court of Appeals did not hold that the detention was prolonged by the questioning, there was no additional seizure within the meaning of the Fourth Amendment." *Id.* at 101. Similarly, in *Johnson*, three officers pulled over a car that contained three people. While one officer was retrieving the license and registration from the driver, another officer questioned Johnson, one of the passengers. The

We have addressed some form of this question in several recent cases. In *United States v. Farrior*, 535 F.3d 210 (4th Cir. 2008), we considered the reasonableness of a "minimal" delay caused by a police officer's inexperience, where during the delay a drug dog arrived and alerted to the presence of drugs. *Id.* at 215. Because there was no evidence of subterfuge or stalling on the part of the police officer, we held the delay was not unreasonable. *Id.* at 220. In *United States v. Mason*, 628 F.3d 123 (4th Cir. 2010), we held that unrelated questioning that took "one to one and one-half minutes" was not unreasonable, because the stop was conducted "promptly and with efficiency." *Id.* at 132. In *Digiovanni*, in contrast, we held that a stop exceeded the permissible duration and scope of a routine traffic stop because the officer "failed to diligently pursue the purposes of the stop and embarked on a sustained course of investigation into the presence of drugs in the car that constituted the bulk of the encounter" between the officer and the defendant." 650 F.3d at 509.

As we explained in *Digiovanni*, for a traffic stop to satisfy *Terry*'s second prong, the police officer "must diligently pursue the investigation of the justification for the stop." *Id.* (citing *Sharpe*, 470 U.S. at 686). Although we have held that "where a delay can be characterized as *de minimis* under the totality of the circumstances, it will not be recognized as a Fourth Amendment violation," *id.* (citing *Mason*, 628 F.3d at 132), the principal inquiry, as articulated by the Sixth Circuit, is "the officer's diligence—i.e., his persevering or devoted application to accomplish the undertaking of ascertaining whether the suspected traffic violation occurred, and, if necessary, issuing a ticket." *United States v. Everett*, 601 F.3d 484,

---

questioning of Johnson did not "measurably extend the duration of the stop," presumably because the other officer was simultaneously investigating the suspended license, which had provided the justification for the stop. 129 S. Ct. at 788. Therefore, the "officer's inquiries into matters unrelated to the justification for the traffic stop" did not "convert the encounter into something other than a lawful seizure." *Id.*

494 (6th Cir. 2010) (internal quotation marks and alterations omitted). If "the totality of the circumstances, viewed objectively, establishes that the officer, without reasonable suspicion, definitively abandoned the prosecution of the traffic stop and embarked on another sustained course of investigation, this would surely bespeak a lack of diligence." *Id.* at 495.

This standard incorporates both the duration and scope components of *Terry*'s second prong. Some courts and commentators have questioned whether the scope component survives *Johnson*. *See United States v. Stewart*, 473 F.3d 1265, 1269 (10th Cir. 2007) ("The correct Fourth Amendment inquiry (assuming the detention is legitimate) is whether an officer's traffic stop questions 'extended the time' that a driver was detained, regardless of the questions' content."); Reid M. Bolton, Comment, *The Legality of Prolonged Traffic Stops After Herring: Brief Delays as Isolated Negligence*, 76 U. Chi. L. Rev. 1781, 1786–87 (2009). We disagree, because, as we have explained: "[T]he scope of a police officer's actions during a traffic stop still is relevant to the reasonableness analysis under the Fourth Amendment . . . because, during a stop, a police officer must act reasonably, that is, he must diligently pursue the investigation of the justification for the stop." *Digiovanni*, 650 F.3d at 509. *Johnson* holds only that unrelated questioning that does not prolong a traffic stop does not render the stop unlawful. In cases where, as here, the questioning does extend the seizure, the scope of an officer's unrelated investigation could be relevant to whether the officer "definitively abandoned the prosecution of the traffic stop and embarked on another sustained course of investigation." *Everett*, 601 F.3d at 495.[7]

---

[7]Neither *Farrior*, 535 F.3d at 210, nor *Mason*, 628 F.3d at 123, is contrary to our observation that the scope component retains vitality in the context of traffic stops prolonged by unrelated investigation. That is, in neither case did we hold that the reasonableness of a prolonged traffic stop is judged solely in terms of duration. *Farrior* involved a challenge to a traffic stop that was prolonged, permitting a drug dog to arrive at the

We acknowledge that in *Digiovanni* the issue was whether police *questioning* caused the traffic stop to exceed its permissible scope and duration. Here, in contrast, the action Guijon-Ortiz argues prolonged the stop was the call to ICE, which Flowers made from the patrol car while the three men waited in the pickup truck. We believe the "diligently pursue" standard applies nonetheless, because either questioning a person directly or pursuing other means of investigation may, in the context of a particular traffic stop, be relevant to whether an officer diligently pursued the investigation of the justification for the stop.

Our approach is in accord with not only that of the Sixth Circuit in *Everett* but also that of at least the Eighth and Ninth Circuits. *See United States v. Turvin*, 517 F.3d 1097, 1101 (9th Cir. 2008) (holding that "whether questioning unrelated to the purpose of the traffic stop and separate from the ticket-writing process that prolongs the duration of the stop may nonetheless be reasonable" is determined by "examin[ing] the 'totality of the circumstances' surrounding the stop"); *United States v. Olivera-Mendez*, 484 F.3d 505, 510 (8th Cir. 2007) ("Whether a particular detention is reasonable in length is a fact-intensive question, and there is no per se time limit on all traffic stops. When there are complications in carrying out the traffic-related purposes of the stop, for example, police may

---

scene. We held that, "[i]n light of the district court's finding that the 'additional time required to take the license and registration and write the ticket was minimal,' we conclude that any delay in conducting the first drug-dog sniff amounted to a *de minimis* intrusion on Farrior's liberty interest." 535 F.3d at 220 (citation to record omitted). In *Mason*, we held, "The one to two of the 11 minutes devoted to questioning on matters not directly related to the traffic stop constituted only a slight delay that raises no Fourth Amendment concern." 628 F.3d at 132. In those cases the primary factor that rendered the prolonged stops reasonable was their short duration. This would not preclude a future court from finding that the scope of an officer's questioning or other investigation would itself demonstrate that the officer had definitively abandoned the prosecution of the traffic stop and prolonged the seizure without reasonable suspicion.

reasonably detain a driver for a longer duration than when a stop is strictly routine.") (citing *Sharpe*, 470 U.S. at 685-87).[8]

Some courts have described the relevant inquiry as whether the time an officer spent on unrelated questioning was "*de minimis*." *See, e.g.*, *United States v. Purcell*, 236 F.3d 1274 (11th Cir. 2001) ("[T]he request for the criminal histories prolonged the traffic stop, at most, by approximately three minutes. We conclude that this delay was *de minimis* in the context of the totality of the circumstances of this traffic stop."); *United States v. Alexander*, 448 F.3d 1014, 1016 (8th Cir. 2006) ("[D]og sniffs that occur within a short time following the completion of a traffic stop are not constitutionally prohibited if they constitute only *de minimis* intrusions on the defendant's Fourth Amendment rights."). Despite this language, which might imply that only the duration of an extended stop is relevant, we read those cases as consistent with ours; under either their approach or ours, ultimately the reasonableness of an extended seizure for an unrelated investigation is evaluated under the totality of the circumstances. *See id.*

The Seventh Circuit's approach is somewhat different. It has held that questions unrelated to the justification for a traffic stop "that hold potential for detecting crime, yet create little or no inconvenience, do not turn reasonable detention into unreasonable detention." *United States v. Childs*, 277 F.3d 947, 954 (7th Cir. 2002) (en banc). It thus uses a type of balancing test that weighs the questions' "potential for detecting crime" against the extent of inconvenience caused when a

---

[8]The Fifth Circuit's approach is also consistent with ours, focusing on the overall reasonableness of the traffic stop, though it has not described its analysis in totality-of-the-circumstances terms. *See United States v. Macias*, ___ F.3d ___, 2011 WL 4447888, at *6-*7 (5th Cir. Sept. 27, 2011) (holding that "extensive[ ]" questioning on "unrelated topics" that extended the stop "by some length of time" "unreasonably prolonged the detention without developing reasonable suspicion of additional criminal activity").

traffic stop is prolonged to ask those questions. The court explained: "[Such questions] do not signal or facilitate oppressive police tactics that may burden the public—for all suspects (even the guilty ones) may protect themselves fully by declining to answer. Nor do the questions forcibly invade any privacy interest or extract information without the suspects' consent." *Id.* In most circumstances, this approach is probably quite similar to ours. Indeed, in *Childs* itself one officer asked a passenger the challenged question (about drugs) while another officer was performing the license and warrant checks on the driver. *Id.* at 949. But to the extent *Childs* requires a defendant to show, for example, that an officer's investigation into a matter unrelated to a traffic stop constitutes an "oppressive police tactic[ ]," we simply observe that is not the approach we articulate here.[9]

## C.

We now turn to the stop leading to the discovery of evidence of Guijon-Ortiz's illegal reentry. Guijon-Ortiz argues that at the moment Flowers learned there were no outstanding warrants associated with the three names he had given the dispatcher, the justification for the traffic stop ended. At that point, he argues, the Fourth Amendment required Flowers to return the ID cards and send the driver and passengers on their way. We disagree. Although the officer's call to ICE was unrelated to the justification for the stop and extended the

---

[9]We also expressly do not adopt the *Childs* court's discussion about whether a stop supported by probable cause gives officers freer rein to ask unrelated questions than do stops supported only by reasonable suspicion. *See Childs*, 277 F.3d at 952-53 ("[A]lthough traffic stops usually proceed like *Terry* stops, the Constitution does not require this equation. Probable cause makes all the difference."); *see also Turvin*, 517 F.3d at 1103 (citing that discussion in *Childs* as "persuasively reasoned"). As we have repeatedly held and reaffirm today, the *Terry* two-step framework, including the requirement that a traffic stop be limited in both duration and scope, applies to traffic stops even if an officer has probable cause that a traffic violation occurred.

time (if only for a portion of "a few minutes") during which the officer kept the vehicle at the side of the highway, the totality of the circumstances demonstrates that Flowers "diligently pursue[d] the investigation of the justification for the stop," *Digiovanni*, 650 F.3d at 509, and was not otherwise "dilatory in [his] investigation."[10] *Sharpe*, 470 U.S. at 686-87. The facts here demonstrate that Flowers acted diligently for several reasons.

First, calling ICE to inquire into the validity of the Gaitan ID is analogous in many ways to how an officer routinely runs a driver's license and registration to check their validity. Although the record does not reflect whether Flowers could have checked the validity of the ID without calling ICE, the fact is that the defendant voluntarily handed the officer an ID that the circumstances show the defendant knew to be fraudulently made. During a traffic stop an officer may "request[ ] a driver's license and vehicle registration" and "run[ ] a computer check." *Digiovanni*, 650 F.3d at 507. The similarity of the officer's actions here to those actions is a factor demonstrating diligence.[11]

---

[10]The government argues the officer's call to ICE did not "prolong" the stop—and therefore we need not reach the "diligently pursue" question—because the officer could have taken the time to issue a traffic citation and the call to ICE took less time than issuing a citation would have taken. In other words, the government sees the temporal baseline as when the officer would have finished issuing a citation if he had chosen to do so. This argument misperceives both the facts and the law. Here there was just one officer conducting the traffic stop and, at the time he called ICE, his concern that the driver was dangerously impaired had not yet been dispelled. J.A. 44-45. Thus, nothing in the record shows that the officer decided to make the call *instead of* issuing a traffic citation. Moreover, as discussed above, the requirement that an officer diligently investigate the justification for a traffic stop applies to the entire stop, not just after the time the officer would have issued a traffic citation if he or she had chosen to do so.

[11]To be clear, the voluntariness of the defendant's decision to hand Flowers the ID is not dispositive. Although the defendant consented to providing the ID, we do not interpret that act as also providing consent to an extended seizure. *See supra* at 11-12 n.4 (citing *Bostick*, 501 U.S. at 434).

Second, the time it took to call ICE was very brief. The record is unclear on precisely how much time passed between when Flowers learned that there were no outstanding warrants for Juan, Noe, and "Daniel Gaitan" and when he learned from Hilton that the name and number on the LPR card did not match. All the record confirms is that it took less than "a few minutes." But it is clear from the record that the amount of time was substantially less than, for example, the time the officer in *Digiovanni* took to question the defendant about drug trafficking, questioning that was "extensive and time-consuming." 650 F.3d at 510. It was also less than the duration of the unrelated questioning in *Mason*. Although we described the unrelated questioning as causing only a "brief delay," *see Mason*, 628 F.3d at 133, in fact the questioning there was extensive in scope, including roughly a dozen questions about matters unrelated to the tint of the vehicle's windows, which had provided the justification for the stop. *See id.* at 139 (Gregory, J., dissenting).[12] The fact that Flowers made just a single, brief phone call does not demonstrate that he had definitively abandoned the prosecution of the traffic stop and embarked on another sustained course of investigation.

Third, as in *Everett*, the purpose of the stop was "still alive" at the time Flowers called ICE. *See Everett*, 601 F.3d at 492 n.9. Flowers stopped the truck when it exceeded the speed limit and weaved onto the shoulder, which led him to believe the driver was "probably impaired." J.A. 38. At the time he ran the warrant search and called ICE, he had not yet assured himself that the driver had not been drinking. Only after he returned to the vehicle to tell the driver that Guijon-Ortiz would be taken to ICE was Flowers able to assure himself that the driver had not been drinking.

---

[12]In a different part of the opinion in *Mason* we held that, during a later portion of the traffic stop, the officers had reasonable suspicion of criminal activity. 628 F.3d at 130. That part of the opinion is not relevant to our discussion here.

Fourth, although checking the validity of the LPR card and thereby checking the defendant's immigration status was unrelated to the purpose of the traffic stop—and thereby beyond the scope of the justification for the stop—the call was a single, brief detour from an otherwise diligent investigation into whether the driver was impaired. A different situation might have been presented if, for example, Flowers had not only called ICE but also called the IRS to check about unpaid taxes, the West Virginia Bureau for Child Support Enforcement to check about unpaid child support, or some other dalliance into unrelated records of possible wrongdoing.

For these reasons, we conclude that, under the totality of the circumstances, and despite the brief phone call to ICE to verify the validity of the LPR card the defendant had provided, the officer diligently pursued the investigation into the driver's perceived impairment. Therefore, we need not decide whether the officer had reasonable suspicion to believe illegal activity was afoot at the time he called ICE. Nor need we address the government's argument that, if the prolonged seizure was unlawful, an exception to the exclusionary rule applies. *See United States v. Oscar-Torres*, 507 F.3d 224, 231-32 (4th Cir. 2007).

### III.

We pause here to emphasize the narrowness of our holding. The time it took for the officer to call ICE was at most "a few minutes." The officer's concern that led to the stop—that the driver was somehow dangerously impaired—had not yet been dispelled. And, Flowers chose to call ICE to verify the validity of the Gaitan ID the (somewhat nervous) defendant provided, rather than subjecting him to questioning on the topic. Extending the stop to verify the validity of the ID without reasonable suspicion might well have rendered the stop unreasonable if the stop had been longer or if some other aspect of the officer's conduct had demonstrated definitive abandonment of the prosecution of the traffic stop.

Our approach thus is narrower than that of the district court below. The district court held that extending the stop to call ICE was permissible because Flowers would have been permitted to keep the car and its passengers seized for "the time necessary to issue the citation for speeding," and his decision to "devote[ ] that time to the ICE check [was] a constitutionally permissible choice." *Guijon-Ortiz*, 2009 WL 4545104 at *3. To the extent under this approach the reasonableness of a prolonged traffic stop would be judged based solely on the duration of the stop, we reject that reasoning.

Possessing probable cause that a driver has committed a traffic infraction does not give an officer free rein to keep the vehicle and its passengers on the side of the road while the officer investigates any hunch, whether through questioning or other methods, so long as the stop is shorter than the time it would have taken to conduct the ordinary incidents of a traffic stop. Traffic stops are not hypothetical imaginings; they are real world interferences with constitutional liberty, permissible only when they are constitutionally reasonable. "The reasonableness of a seizure depends on what the police *do*, not on what they might have done." *Childs*, 277 F.3d at 953. Although an officer may investigate matters unrelated to the justification for a traffic stop, those investigatory pursuits must be limited in both scope and duration, and are evaluated under the totality of the circumstances.

IV.

For the reasons set forth, the district court's order denying Guijon-Ortiz's motion to suppress is

*AFFIRMED*.