<u>**UNPUBLISHED**</u>

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

**No. 10-4416**

———————————

UNITED STATES OF AMERICA,

                Plaintiff - Appellee,

     v.

REGINALD LAMAR DAVIS,

                Defendant - Appellant.

———————————

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte.  Martin K. Reidinger, District Judge.  (3:08-cr-00260-MR-1)

———————————

Argued:  October 28, 2011      Decided:  December 29, 2011

———————————

Before NIEMEYER, DUNCAN, and FLOYD, Circuit Judges.

———————————

Affirmed by unpublished per curiam opinion.

———————————

**ARGUED:** Noell Peter Tin, TIN, FULTON, WALKER & OWEN, PLLC, Charlotte, North Carolina, for Appellant.  Melissa Louise Rikard, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.  **ON BRIEF:** Matthew G. Pruden, TIN, FULTON, WALKER & OWEN, PLLC, Charlotte, North Carolina, for Appellant.  Anne M. Tompkins, United States Attorney, Charlotte, North Carolina, Richard Lee Edwards, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee.

———————————

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Officers stopped Reginald Lamar Davis, a convicted felon, after observing that his vehicle contained what they suspected to be an illegal window tint. During the stop, they discovered that Davis's license was suspended and opted to issue him a citation for that infraction. After they finished writing the citation, one of the officers requested that Davis step out of the vehicle. Davis complied. The officer then asked whether any drugs or weapons were in the car and if they could search it. Davis responded that none were and consented to the search. While one officer searched Davis's vehicle, another officer provided Davis with the citation and explained it to him. The search of the vehicle eventually yielded marijuana and a firearm.

Davis was charged with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g). Prior to trial, he moved to suppress the seized firearm on the ground that it was the fruit of an illegal seizure. The district court declined to suppress the firearm, and a jury subsequently convicted Davis. On appeal, he contends that the district court erred in denying his motion to suppress because the officers extended the scope and duration of the traffic stop beyond the circumstances justifying it. We affirm.

On July 9, 2008, Officers Steven Flatt and Joseph Dollar participated in a saturation patrol in Charlotte, North Carolina. The saturation patrol involved numerous officers patrolling a short stretch of road in a high crime area and stopping motorists for minor traffic infractions. Its purpose was to make an increased police presence known in the area. On this particular day, Officer Flatt was training Officer Dollar, who was graduated from the police academy only about a week earlier. They were parked in a school parking lot along with another officer, Officer Charles Bolduc, who was in a separate vehicle. Officer Bolduc was completing a report while Officer Flatt watched traffic.

Officer Flatt observed a vehicle driven by Davis pass the school parking lot. The tint of the vehicle's windows appeared to Officer Flatt to be darker than allowed under North Carolina law, so he decided to conduct a traffic stop. Officers Flatt and Dollar pursued Davis in their vehicle, and Officer Bolduc, who had a tint meter, followed them.

The officers signaled their blue lights, prompting Davis to pull into the parking lot of a nearby gas station. Using his tint meter, Officer Bolduc read the level of window tint and determined that it did not comply with North Carolina law. Meanwhile, Officer Dollar obtained Davis's license and

3

registration. Officers Flatt and Dollar returned to their police vehicle to run a check on Davis's license, which revealed that his license was suspended. They decided to cite Davis for driving with a suspended license rather than for an illegal window tint.

While Officer Dollar prepared the citation, Officer Flatt returned to Davis's vehicle to explain that they were citing him for driving with a suspended license but not for the unlawful window tint. During this time, Sergeant Gary Brown arrived and informed the other officers that he earlier had seen Davis "hanging out" at an apartment complex known for criminal activity. Because Officer Dollar was in training, preparing the citation took a little longer than usual, but it nevertheless took only a few minutes. At one point, he and Officer Flatt discussed whether to ask for consent to search Davis's car. Officer Dollar expressed an interest in observing Officer Flatt ask for consent.

Officer Dollar finished preparing the citation, and he and Officer Flatt returned to Davis's vehicle. Officer Flatt requested that Davis step out of his vehicle. His purpose in doing so was to explain the citation and to ask for consent to search the vehicle. Davis complied and exited the vehicle.

Officer Flatt asked Davis whether any drugs or weapons were in his vehicle. After Davis responded that none were, Officer

4

Flatt asked for consent to search the vehicle, which Davis provided. This exchange lasted only a matter of seconds.

Officer Dollar began searching Davis's vehicle while Officer Flatt handed Davis the citation, noted the court date, and asked whether he had any questions. Davis remained cooperative at all times. At one point, when Officer Dollar struggled to open the glove compartment, Davis demonstrated how to open it. As Officer Dollar searched the vehicle, Officer Flatt asked for consent to search Davis's person, to which Davis agreed. Officer Flatt discovered around $1,600.00 in cash on Davis's person, but no contraband.

Officer Dollar, however, found a small amount of marijuana in the vehicle. This discovery prompted Officer Flatt to join the search of the vehicle, leading to the discovery of a larger bag of marijuana and a handgun in the center console. Officer Flatt returned to Davis and placed him under arrest. As he did so, he asked Davis why he had failed to tell him about the handgun. Davis responded that he was a convicted felon. Officer Flatt then instructed Davis as to his Miranda rights.

A grand jury returned a one-count indictment on December 17, 2008, charging Davis as a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g). Prior to trial, Davis filed a motion to suppress, seeking to exclude the firearm that the officers seized during the search of his vehicle. He asserted

that his continued detention after the officers completed writing the citation, but before they issued it to him, was unlawful. According to Davis, the officers exceeded the scope of the traffic stop. He also sought to suppress statements he made to the officers. The district court referred the motion to a magistrate judge, who conducted a suppression hearing and subsequently recommended that Davis's motion be granted.

The district court, however, rejected the magistrate judge's recommendation. It disagreed with the magistrate judge that it should suppress the firearm. It reasoned that the request for consent to search took only a few seconds and did not unreasonably prolong the traffic stop. The district court further determined that Davis's consent was voluntary. As for Davis's incriminating statements, the district court suppressed the statements he made after Officer Flatt began arresting him, but before receiving his Miranda warnings. It declined to suppress any statements made after Davis received his Miranda warnings.

The case proceeded to trial on August 17, 2009, but ended in a mistrial the following day. Davis's second trial began on October 13, 2009. Two days later, the jury returned a guilty verdict. The district court subsequently sentenced Davis to 188 months of imprisonment and three years of supervised release.

Davis immediately filed a notice of appeal on the day judgment was entered.

## II.

Davis raises one issue on appeal. He contends the district court erred in denying his motion to suppress the firearm seized during the search of his vehicle.

When reviewing the district court's ruling on the motion to suppress, we will not disturb its factual findings unless we find they are clearly erroneous. United States v. Massenburg, 654 F.3d 480, 485 (4th Cir. 2011). Its legal determinations, however, warrant de novo review. Id. Because the district court denied the motion to suppress, we view the evidence in the light most favorable to the government. United States v. Hampton, 628 F.3d 654, 658 (4th Cir. 2010).

## III.

### A.

Traffic stops implicate the Fourth Amendment because they amount to seizures of the subject vehicle's occupants. Whren v. United States, 517 U.S. 806, 809-10 (1996). Therefore, to be lawful, a traffic stop must comply with the Fourth Amendment's command that all searches and seizures be reasonable. See id. at 810.

We have recognized that traffic stops are most akin to investigatory detentions, which means that the standard announced in Terry v. Ohio, 392 U.S. 1 (1968), for determining the legality of an investigatory detention also guides our determination as to the legality of a traffic stop. United States v. Digiovanni, 650 F.3d 498, 506 (4th Cir. 2011). This standard contains a dual inquiry. United States v. Guijon-Ortiz, 660 F.3d 757, 764 (4th Cir. 2011). Courts must first determine whether the stop was justified at its inception, which requires, at a minimum, that law enforcement officers possessed a reasonable suspicion that crime was afoot before detaining the suspect. Terry, 392 U.S. at 20, 30. If the stop was justified at its inception, courts must next ensure that it was reasonably related in scope to the circumstances justifying it, id. at 20, which means that it was limited in scope and duration, Digiovanni, 650 F.3d at 507.

## B.

Traffic stops are justified at their inception when officers observe a violation of the applicable traffic laws. See United States v. Branch, 537 F.3d 328, 335 (4th Cir. 2008). There is no question that Officers Flatt and Dollar were justified in stopping Davis. They perceived that the level of his window tint likely violated North Carolina law, which

8

provided them with adequate justification to conduct a traffic stop. Davis rightly concedes that the traffic stop was justified at its inception. He contends, however, that the officers extended the scope and duration of the traffic stop beyond the circumstances justifying it.

C.

We determine whether traffic stops are appropriately limited in scope and duration by considering the totality of the circumstances. See Guijon-Ortiz, 660 F.3d at 770. This inquiry is necessarily highly fact specific. Id. at 764. Officers act within the scope of the original justification for a stop when they utilize investigative methods that are "the least intrusive means reasonably available to verify or dispel [their] suspicion[s] in a short period of time." Florida v. Royer, 460 U.S. 491, 500 (1983) (plurality opinion). The duration inquiry turns on whether the officers "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." United States v. Sharpe, 470 U.S. 675, 686 (1985).

In a routine traffic stop, the scope and duration of the stop is generally limited to "requesting a driver's license and vehicle registration, running a computer check, and issuing a

ticket." Digiovanni, 650 F.3d at 507. Officers must obtain the driver's consent or possess a reasonable suspicion of criminal activity before they extend the traffic stop beyond what is reasonably necessary to carry out these tasks. Id. Otherwise, "once the driver has demonstrated that he is entitled to operate his vehicle, and the police officer has issued the requisite warning or ticket, the driver 'must be allowed to proceed on his way.'" Branch, 537 F.3d at 336 (quoting United States v. Rusher, 966 F.2d 868, 876 (4th Cir. 1992)).

Nevertheless, during the course of a traffic stop, officers may question motorists about matters unrelated to its original justification as long as the questioning "occurs within the timeframe reasonably necessary to effectuate the traffic stop." United States v. Mason, 628 F.3d 123, 131 (4th Cir. 2010). We do not require that "[a]n officer's questions or actions during the course of a traffic stop . . . be solely and exclusively focused on the purpose of that detention." Id. Our principal concern, with respect to both the scope and duration of the traffic stop, is whether the officer diligently pursued the objective of the original purpose of the stop. Guijon-Ortiz, 660 F.3d at 766. As long as the officer diligently pursues the purpose of the traffic stop, which generally involves performing those tasks attendant to investigating the traffic violation and, if appropriate, issuing a citation, some unrelated

10

questioning is reasonable. See Digiovanni, 650 F.3d at 507-09. But when the unrelated questions demonstrate that the officer has "'definitively abandoned the prosecution of the traffic stop and embarked on another sustained course of investigation' or where the unrelated questions 'constitute[] the bulk of the interaction' between the police officer and the defendant," they unreasonably extend the scope and duration of the stop. Id. at 508-09 (quoting United States v. Everett, 601 F.3d 484, 495 (6th Cir. 2010)). Relevant to this consideration is whether the delay caused by the unrelated questioning was de minimis. See id. at 509.

Davis insists that, after Officer Dollar completed writing the citation, the purpose of the stop was effectuated and Officer Flatt should have given him the ticket and allowed him to proceed on his way. Instead, according to Davis, Officer Flatt unlawfully extended the scope and duration of the traffic stop by asking him to step out of the vehicle, questioning him about the presence of weapons or drugs, and requesting consent to search the vehicle. These actions and unrelated questions, Davis contends, rendered the stop unlawful. As a result, he maintains, the district court should have suppressed the firearm because the unlawful detention tainted his consent to the search of his vehicle and the subsequently seized firearm is a fruit of the unlawful search and seizure.

11

Contrary to Davis's assertions, at the time Officer Flatt asked him to exit his vehicle and requested consent to search, the officers had not effectuated the purpose of the traffic stop. The purpose of the traffic stop was to investigate a traffic violation and, if appropriate, issue a citation. After learning that Davis's license was suspended, the officers' ultimate purpose was to issue a citation for driving with a suspended license. Issuance of the citation was the necessary and final step to effectuating the purpose of the stop. Hence, although the officers had finished writing the citation, they had not issued it and therefore had not yet effectuated the purpose of the stop. With this in mind, we must determine whether the officers' actions and unrelated questions toward the end of the traffic stop demonstrate a lack of diligence so as to unlawfully extend the scope and duration of the stop beyond the circumstances justifying it.

To complete the final step of issuing the citation, Officer Flatt requested that Davis step out of his vehicle, partly so he could explain the citation to him before issuing it. Officers may, of course, ask drivers to step out of their vehicles during a traffic stop. See Pennsylvania v. Mimms, 434 U.S. 106, 111 n.6 (1977) (per curiam) ("[O]nce a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating

12

the Fourth Amendment's proscription of unreasonable searches and seizures."). It was therefore reasonable and permissible for Officer Flatt to ask Davis to step out of the vehicle to explain and issue the citation. Furthermore, asking Davis to step out of the vehicle to explain and issue the citation was tailored to the underlying justification for the stop—issuing the citation. Thus, Officer Flatt's request that Davis exit the vehicle does not suggest a lack of diligence in prosecuting the stop and did not extend the scope and duration of the stop beyond the circumstances justifying it.

Officer Flatt's following two questions, which asked whether any drugs or weapons were in the vehicle and for consent to search it, were unrelated to the underlying justification for the traffic stop, but they do not demonstrate a lack of diligence in prosecuting the stop so as to unlawfully extend its scope and duration beyond the circumstances justifying it. They neither constituted the bulk of the encounter between Officer Flatt and Davis nor signaled a definitive abandonment of the prosecution of the traffic stop to embark on another sustained course of investigation. They were the first and only unrelated questions asked until that point. All of the officers' actions leading up to that exchange were tailored to prosecuting the traffic stop. The delay resulting from the exchange, which lasted a matter of seconds, was de minimis. Furthermore, after

13

obtaining Davis's consent, Officer Flatt returned to prosecuting the traffic stop while Officer Dollar searched the vehicle. Officer Flatt explained the citation to Davis and issued it to him. Because the officers diligently pursued the objective of the traffic stop, we hold that the brief exchange surrounding the request for consent did not extend the scope and duration of the stop in a manner that rendered the stop unconstitutional.

Thus, Davis's consent was not the product of an illegal detention. As Davis's consent was voluntary[*] and provided during a lawful detention, it was valid and not tainted. When Davis provided his consent to search the vehicle, he necessarily consented to an extension of the traffic stop long enough for the officers to conduct the search. See United States v. Rivera, 570 F.3d 1009, 1013-14 (8th Cir. 2009) ("When a motorist gives consent to search his vehicle, he necessarily consents to an extension of the traffic stop while the search is conducted . . . ."). His further detention during the search of his vehicle was, therefore, lawful. The consensual search yielded the firearm at issue. Because the firearm was recovered

---

[*] As earlier noted, the district court found that Davis's consent to the search was voluntary. Similarly, at oral argument, Davis conceded that he did not assert the consent was involuntary in the sense that his will was overborne, just that it was the product of an illegal detention.

14

during a lawful detention and search, it was not tainted, and the district court correctly declined to suppress it.

IV.

For the foregoing reasons, we affirm the decision of the district court.

AFFIRMED