**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 13-4365**

_____

UNITED STATES OF AMERICA,

               Plaintiff - Appellee,

     v.

SHANE TRENIER COHEN,

               Defendant - Appellant.

_____

Appeal from the United States District Court for the Eastern District of North Carolina, at Wilmington. Louise W. Flanagan, District Judge. (7:11-cr-00164-FL-1)

_____

Argued: September 19, 2014        Decided: December 5, 2014

_____

Before TRAXLER, Chief Judge, NIEMEYER, Circuit Judge, and DAVIS, Senior Circuit Judge.

_____

Affirmed by unpublished per curiam opinion. Judge Davis wrote a separate concurring opinion.

_____

**ARGUED:** Stephen Clayton Gordon, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Raleigh, North Carolina, for Appellant. Joshua L. Rogers, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Thomas P. McNamara, Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Raleigh, North Carolina, for Appellant. Thomas G. Walker, United States Attorney, Jennifer P. May-Parker, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Shane Trenier Cohen pled guilty to possession with intent to distribute marijuana, in violation of 21 U.S.C. § 841(a)(1), and to possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1), reserving his right to appeal the district court's denial of his motion to suppress. We affirm.

## I.

### A.

On August 2, 2011, Detectives David Beckwith and Lacy Ray Ward of the Warsaw, North Carolina, police department observed Cohen, who was driving a Ford Explorer, make a right turn off of Highway 117 and into an area known for drug-trafficking and other criminal activity. When the officers turned in behind Cohen, Cohen made a left turn, another left turn, and pulled into a gas station. The officers found Cohen's route to be odd because Cohen could have arrived at the gas station much quicker if he had stayed on Highway 117. Cohen entered the gas station, where he stayed for less than a minute. The officers continued to follow him as he drove away. When the officers observed Cohen come within ten feet of a small car ahead of him, they stopped him for following too closely.

Detective Beckwith walked up to the driver's side of the Explorer and introduced himself to Cohen. He explained the

3

reason for the traffic stop and obtained Cohen's driver's license. Based upon his experience as a police officer, Detective Beckwith immediately noticed that Cohen was acting unusually nervous for a simple traffic stop. He "was breathing rapidly, not making good eye contact, frequently taking sips of his drink, was excessively talkative, strangely agreeable and polite, and hesitated when answering if he had ever been arrested." J.A. 99. Detective Ward, who had approached the passenger side of the Explorer and conversed briefly with Cohen, likewise perceived him to be unusually nervous.

After briefly returning to the patrol car and verifying that Cohen's driver's license was active, Detective Beckwith asked Cohen to step out of the vehicle. Cohen complied, but his demeanor noticeably changed "from being nervous to extremely nervous to almost disagreeable." J.A. 29. Cohen began to ask questions such as, "Why [are] you doing this," and "Why [are] you stopping me?" J.A. 187 (internal quotation marks omitted). When Detective Beckwith asked Cohen if he had a weapon on him, Cohen "raised his hands and said 'No.'" J.A. 29. Detective Beckwith then patted Cohen's pockets and felt two "blunt cigar wrap[s]" in his left pants pocket. J.A. 101.[1] Detective

---

[1] Although Detective Beckwith at times referred to the evidence as "blunt cigars," it is clear from the record that the

4

Beckwith testified that such blunt wraps are typically used to roll marijuana, and he had never encountered anyone who carried blunt wraps along with loose tobacco for the purpose of rolling non-marijuana cigars. Detective Beckwith asked Cohen if he "smoked weed," which Cohen denied. J.A. 29. Cohen told Detective Beckwith that he had the blunt wraps because he had started smoking cigars, but he also referred to the papers as blunt wraps. During the traffic stop, Cohen admitted to Detective Beckwith that he had been previously arrested and convicted for possession of marijuana.

After the pat-down search, Detective Beckwith escorted Cohen to the front passenger seat of his patrol car. Detective Beckwith informed Cohen that he was only going to write him a warning citation and that Cohen would not have to go to court or pay a fine. According to Detective Beckwith, "[n]ormally on traffic stops, normal people when they realize they are not going to get cited or it is not going to cost them any money to go to court, I notice that their nervousness usually goes down." J.A. 29-30. Cohen's nervousness, however, escalated.[2] While he

_____

evidence removed from Cohen's pocket were blunt <u>wraps</u> that contained no tobacco or marijuana. J.A. 29, 158.

[2] In the initial report, Detective Beckwith stated that he told Cohen he "would not be issuing him a state citation for the violation" before he returned to the patrol car to verify Cohen's license. J.A. 158. Detective Beckwith testified at the

5

was preparing the warning citation, Detective Beckwith additionally attempted to engage Cohen in small talk, inquiring about such things as where Cohen went to school and whether he played ball. Again, Cohen's "nervousness seemed to go up instead of down." J.A. 30. "He continued breathing rapidly, and was fidgeting with his cell phone, wiping his hands on his legs, wrenching his hands, and continuously swallowing." J.A. 99. This "continued increased nervousness through casual conversation after learning that he was only receiving a warning was atypical in Detective Beckwith's experience." J.A. 100.

After completing the warning citation, Detective Beckwith handed it to Cohen and told him to "'[h]ave a nice day' as he stepped out of the [patrol] vehicle." J.A. 30. Detective Beckwith then asked Cohen if there was anything illegal in Cohen's vehicle. Cohen said that there was not and denied Detective Beckwith's request to search the vehicle.

At that point, Detective Beckwith informed Cohen that a K-9 unit would be brought to the scene to sniff the exterior of the vehicle. Approximately two minutes later, dispatch advised the

---

suppression hearing that he told Cohen that he "was just going to write him a warning citation for the violation" when he had Cohen in the patrol car. J.A. 29. Cohen may well have been reassured on both occasions, but it does not matter for our purposes because it is clear that Detective Beckwith's reassurances during the traffic stop never resulted in the expected diminishment of Cohen's nervousness.

officers that Cohen had an outstanding arrest warrant. Detective Ward also remembered that she had been present as an undercover officer during a purchase of crack cocaine from Cohen six years before. Cohen was placed in custody and put back into the patrol car.[3]

Minutes later, the K-9 unit arrived and the dog alerted to the right passenger-side door of the vehicle. In the ensuing search, the officers found approximately a half-pound to a pound bag of marijuana, a set of digital scales, and a stolen .380 caliber handgun. The dashboard camera in the patrol car captured Cohen making several incriminating statements on his cellular phone. And when the contents of Cohen's cellular phone were later downloaded, the officers discovered several incriminating text messages pertaining to drug deals.

B.

On December 13, 2011, the grand jury returned an indictment charging Cohen with possession with the intent to distribute a

---

[3] According to Detective Ward's testimony, the police consult two databases when they run a driver's license check. The National Crime Information Center ("NCIC") database is consulted automatically to determine whether an individual is wanted or a car is stolen, and its results come in quickly. The NCAware database takes anywhere from one to five minutes to return results. NCIC did not return the warrant information, but NCAware did. However, the warrant was not ultimately served because it had no photograph and a different date of birth than the one indicated on Cohen's license.

quantity of marijuana, in violation of 21 U.S.C. § 841(a)(1) (Count 1); possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1) (Count 2); and possession of a firearm after having been convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. §§ 922(g)(1) and 924 (Count 3).

Cohen filed a motion to suppress the evidence found in the vehicle search, his incriminating statements, and the incriminating text messages from his cell phone. He argued that the officers lacked reasonable suspicion of criminal activity sufficient to detain him beyond the scope of the valid traffic stop. Detectives Beckwith and Ward testified at the suppression hearing. Cohen did not testify. The magistrate judge recommended that the motion be granted. The district court denied the motion. Cohen thereafter pled guilty to the first two counts of the indictment, preserving his right to appeal the suppression ruling. He was sentenced to seven months for the marijuana conviction, and to a consecutive five-year term for the firearm offense. This appeal followed.

II.

A.

When reviewing the district court's denial of a motion to suppress, we review its "factual findings for clear error and its legal conclusions de novo." United States v. Green, 740

8

F.3d 275, 277 (4th Cir. 2014).  "We construe the evidence in the light most favorable to the government, as the prevailing party below."  Id.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  A vehicle stop by the police is a seizure within the meaning of the Fourth Amendment.  See Whren v. United States, 517 U.S. 806, 809-10 (1996).  "[T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."  Id. at 810. "Any ulterior motive a police officer may have for making the traffic stop is irrelevant."  United States v. Digiovanni, 650 F.3d 498, 506 (4th Cir. 2011).

"A lawful traffic stop 'begins when a vehicle is pulled over for investigation of a traffic violation' and ends 'when the police have no further need to control the scene, and inform the driver and passengers they are free to leave.'"  Green, 740 F.3d at 279 (quoting Arizona v. Johnson, 555 U.S. 323, 333 (2009)).  "[O]nce the driver has demonstrated that he is entitled to operate his vehicle, and the police officer has issued the requisite warning or ticket, the driver must [ordinarily] be allowed to proceed on his way."  United States v. Branch, 537 F.3d 328, 336 (4th Cir. 2008) (internal quotation

9

marks omitted).  The police officer, however, may detain a driver **beyond** the scope of the lawful traffic stop if the officer "possess[es] a justification for doing so other than the initial traffic violation that prompted the stop in the first place."  Id. at 336.  Such "a prolonged automobile stop requires either the driver's consent or a 'reasonable suspicion' that illegal activity is afoot."  Id.  Such "[r]easonable suspicion is demonstrated when an officer points to specific and articulable facts which, taken together with rational inferences from those facts, evince more than an inchoate and unparticularized suspicion or hunch of criminal activity." United States v. Mason, 628 F.3d 123, 128 (4th Cir. 2010) (internal quotation marks and alteration omitted).

When assessing whether a police officer has the requisite reasonable suspicion, the court "must consider the totality of the circumstances" known to the officers at the time, and "give due weight to common sense judgments reached by officers in light of their experience and training."  Id. (internal quotation marks omitted).  "[I]t is entirely appropriate for courts to credit 'the practical experience of officers who observe on a daily basis what transpires on the street.'" Branch, 537 F.3d at 336-37 (quoting United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993)).  Thus, "[c]ourts must look at the cumulative information available to the officer and not find

10

a stop unjustified based merely on a piecemeal refutation of each individual fact and inference." Id. at 337 (internal quotation marks and citation omitted). "It is the entire mosaic that counts, not single tiles." Id. (internal quotation marks omitted). Accordingly, "[a] set of factors, each of which [is] individually 'quite consistent with innocent travel,' c[an] still, 'taken together,' produce a 'reasonable suspicion' of criminal activity." Id. (quoting United States v. Sokolow, 490 U.S. 1, 9 (1989)). But "[t]he articulated innocent factors collectively must serve to eliminate a substantial portion of innocent travelers before the requirement of reasonable suspicion will be satisfied." Digiovanni, 650 F.3d at 511 (internal quotation marks omitted).

## B.

In this case, Cohen does not contest that the traffic stop was justified at its inception and reasonable in its duration. Moreover, the parties agree that the lawful traffic stop concluded when Detective Beckwith handed Cohen the warning citation, told him to have a nice day, and was denied permission to search Cohen's vehicle. Cohen's motion to suppress, therefore, was based upon his claim that the officers did not develop the requisite reasonable suspicion during the traffic stop to justify his detention after it concluded.

11

1.

At the outset, we consider Cohen's assertion that the district court erred in finding that Detective Beckwith's pat-down search of Cohen's clothing was consensual and, therefore, that Cohen's possession of blunt wraps was a pertinent factor in the reasonable suspicion determination. We disagree.

As noted by the district court, "voluntary citizen-police encounters do not implicate the Fourth Amendment." United States v. Black, 525 F.3d 359, 364 (4th Cir. 2008). Moreover, consent to a search need not be express, but "may be inferred from actions as well as words." United States v. Hylton, 349 F.3d 781, 786 (4th Cir. 2003); see United States v. Wilson, 895 F.2d 168, 170 (4th Cir. 1990) (per curiam). The determination of whether a suspect has consented to a search is a subjective one, also evaluated in light of the "the totality of the circumstances." Wilson, 895 F.2d at 171 (internal quotation marks omitted). The district court makes the factual determination of whether there was consent to a search, and we must uphold that finding unless it is clearly erroneous in light of the evidence presented. See id. at 172; United States v. Lattimore, 87 F.3d 647, 650-51 (4th Cir. 1996) (en banc).

In Wilson, a Drug Enforcement Agent observed a suspicious bulge in a defendant's pants and asked for permission to search him. In response, the defendant "shrugg[ed] his shoulders and

12

rais[ed] his arms." 895 F.2d at 172. Noting that the defendant had "raised his arms in response to [the officer's] request for permission to pat him down, a request made without threats, force, or physical intimidation," we held that "[i]t was not 'clearly erroneous' for the district court to find that the search was consensual." Id. at 170.

In this case, the district court likewise found that Detective Beckwith did not threaten or coerce Cohen in any way. Nor did he claim legal authority to search Cohen. When Detective Beckwith asked Cohen if had a weapon, Cohen said "no," and voluntarily raised his arms, which Detective Beckwith reasonably interpreted as an implied consent to search. Thus, Cohen "did not merely consent to a search of his person," as the defendant did in Wilson. J.A. 98. Rather, Cohen's "actions were an affirmative invitation to" Detective Beckwith to search him. J.A. 98.

On appeal, Cohen argues that, even if he impliedly consented to the pat-down search, his actions only indicated a consent to a pat-down search for weapons, and not a consent to the officer's removal of the blunt wraps from his pocket. The district court's factual findings, however, do not support Cohen's current claim that his consent was circumscribed in this way. Nor does the record. As the district court additionally

13

found, Cohen did not "lower his arms, protest, or move away" at any point "before, during, or after the pat-down." J.A. 98.

Accordingly, we hold that the district court did not clearly err in finding that Cohen consented to the search that resulted in discovery of the blunt wraps and, therefore, that the blunt wraps were properly considered as a factor in the officer's reasonable suspicion determination.[4]

2.

Viewing the evidence in the light most favorable to the government, we likewise cannot say that the district court clearly erred in finding that the totality of the circumstances justified Cohen's detention beyond the scope of the lawful traffic stop and, consequently, in denying Cohen's motion to suppress.

As an initial premise, we reject Cohen's contention that the district court erred in considering his nervousness as a pertinent factor in the "reasonable suspicion" determination.

---

[4] Actually, we see no indication that Cohen contested the legality of the pat-down search of his person in his motion to suppress, or argued before the magistrate judge that the search violated the Fourth Amendment. Rather, the magistrate judge appears to have sua sponte recommended that the blunt-wrap evidence be excluded from consideration because Detective Beckwith did not have a reasonable suspicion that Cohen was armed and dangerous. In any event, the only issue before us now is whether the district court clearly erred in finding that the pat-down search was consensual, and we do not consider the question of whether the search would have been invalid absent such consent.

14

"'It is common for most people to exhibit signs of nervousness when confronted by a law enforcement officer whether or not the person is currently engaged in criminal activity.'" United States v Massenburg, 654 F.3d 480, 490 (4th Cir. 2011) (quoting United States v. Salzano, 158 F.3d 1107, 1113 (10th Cir. 1998)) (alteration omitted). But where a suspect exhibits "'signs of nervousness beyond the norm,'" it is a "highly relevant" factor for consideration. Id.; see also United States v. Mayo, 361 F.3d 802, 805-06 (4th Cir. 2004); United States v. McFarley, 991 F.2d 1188, 1192-1193 (4th Cir. 1993).

Here, the district court found that Cohen exhibited "the kind of abnormal nervous behavior that can support reasonable suspicion," J.A. 100, and our precedent supports its determination. Detective Beckwith was an experienced police officer who had been involved in "hundreds" of traffic stops. He immediately noticed that Cohen was exhibiting unusual nervous indicators for a routine traffic stop, a practical judgment that was entitled to the credit the district court gave it. See Mason, 628 F.3d at 128; Branch, 537 F.3d at 336-37. Cohen "was breathing rapidly, not making good eye contact, frequently taking sips of his drink, was excessively talkative, strangely agreeable and polite, and hesitated when answering if he had ever been arrested." J.A. 99. Even so, Detective Beckwith did not base the decision to detain Cohen solely upon these initial

15

observations. Cohen's demeanor, which was initially apologetic and agreeable, turned to disagreeable and defensive when Detective Beckwith asked him to get out of his vehicle. And when Detective Beckwith had Cohen sit in the patrol vehicle to write the warning citation, Cohen's nervousness continued to escalate, despite Detective Beckwith's reassurances that Cohen would only be given a warning citation and his attempts to diminish Cohen's anxiety by engaging him in small talk. Cohen "continued breathing rapidly, and was fidgeting with his cell phone, wiping his hands on his legs, wrenching his hands, and continuously swallowing." J.A. 99. Again, this behavior "was atypical in Detective Beckwith's experience." J.A. 100. Such continued or prolonged nervousness, we have held, can lead to reasonable suspicion because, as Detective Beckwith stated, an innocent individual's initial nervousness usually subsides. See Mason, 628 F.3d at 129 (relying, in part, upon the fact that the suspect "was sweating and unusually nervous when interacting with [the officer], and [his] nervousness did not subside, as occurs normally, but became more pronounced as the stop continued").

In any event, Cohen's abnormally nervous behavior did not serve as the sole basis upon which Detective Beckwith based his suspicion that Cohen's vehicle contained illegal drugs. The officers had just observed Cohen traveling through an area known

16

for drug trafficking and other crimes, also a pertinent factor for consideration. See Lender, 985 F.2d at 154 (noting that while "mere presence in a high crime area is not by itself enough to raise reasonable suspicion, an area's propensity toward criminal activity is [also] something that an officer may consider"). During the course of his conversation with Cohen, Detective Beckwith also learned that Cohen had a prior arrest and conviction for felony possession of marijuana. See United States v. Sprinkle, 106 F.3d 613, 617 (4th Cir. 1997) (noting that while a suspect's criminal history may be insufficient to warrant reasonable suspicion that he is engaged in crime again, "an officer can couple knowledge of prior criminal involvement with more concrete factors in reaching a reasonable suspicion of current criminal activity").

Finally, and importantly, Cohen was found in possession of drug paraphernalia during the traffic stop. Blunt wraps, which were removed from Cohen's person during the consent pat-down search, are commonly associated with the use of drugs and, in particular, with marijuana. See United States v. Sakyi, 160 F.3d 164, 169 (4th Cir. 1998) (holding that the officer "had a reasonable suspicion, based on several hundred cases in which a Phillies Blunt cigar box was associated with marijuana, that drugs were present in the vehicle he stopped").

17

In sum, the totality of the circumstances supports the district court's determination that the officers had reasonable suspicion to detain Cohen beyond the lawful traffic stop. As succinctly summarized by the district court, Cohen was traveling "in a high drug crime area. He displayed unusual and unsubsiding nervous behavior throughout the encounter, despite being told he was only going to receive a warning. Officers learned that he had a prior conviction for possession of marijuana, and found what is commonly known to be marijuana paraphernalia on his person." J.A. 102. Although "none of these factors individually are incapable of having an innocent explanation," when considered collectively and in light of the officers' experience and training, "the combination . . . serve[d] to eliminate a substantial portion of innocent travelers.'" J.A. 102.

## III.

For the foregoing reasons, we affirm the district court's denial of Cohen's motion to suppress.[5]

<u>AFFIRMED</u>

---

[5] Because the totality of the circumstances was sufficient to establish a reasonable suspicion of criminal activity justifying Cohen's detention after the traffic stop concluded, we need not address the government's alternative argument that the discovery of the outstanding warrant within two minutes of the conclusion of the stop would have led to the inevitable discovery of the evidence.

18

DAVIS, Senior Circuit Judge, concurring:

I am pleased to concur in the majority opinion. I offer this short comment to highlight the importance of this case for prosecutors and criminal defense counsel handling suppression motions before United States Magistrate Judges in felony cases, a phenomenon seemingly on the rise in some districts. Although district judges conduct de novo review of magistrate judges' reports and recommendations, magistrate judges are the first-level factfinders, and, absent an evidentiary hearing "do-over" by the district judge, the exclusive authority on demeanor evidence and credibility assessments. See ante at 11-13 & n.4. The lesson here is simply that, as always, counsel need to pay heed to the identity of the factfinder and the relative competence, in the hierarchy of judicial review, of who has the last word on findings regarding the "who, what, when, and where," cf. United States v. Santiago, 268 F.3d 151, 156 (2d Cir. 2001) (Sotomayor, J.), which underlie consequential judicial determinations.